Carol GALLO, Plaintiff,

v.

**JOHN POWELL CHEVROLET, INC., Defendant.**

**No. CV–90–0937.**

United States District Court, M.D. Pennsylvania.

May 24, 1991.

John M. Humphrey, Williamsport, Pa., for plaintiff.

John E. Donovan, Fisher & Phillips, Atlanta, Ga., for defendant.

## MEMORANDUM

McCLURE, District Judge.

## I. BACKGROUND

Plaintiff Carol Gallo filed this Title VII action[1] against her former employer, John Powell Chevrolet ("John Powell" or "the dealership"). She alleges that she was harassed by co-employees[2] and ultimately terminated due to her sex and to her pregnancy. She alleges violations of Title VII and the Pennsylvania Human Relations Act ("PHRA")[3] and seeks back pay, attorney's fees and costs. (Plaintiff's complaint, filed May 18, 1990).

Based upon the evidence submitted at the bench trial held April 29 and 30, 1991, the court finds that John Powell acted with discriminatory intent in discharging Gallo from her position as an automobile salesperson on June 23, 1988 in violation of Title VII and the PHRA and that its decision to terminate her was motivated in substantial part by bias against her due to her gender and her pregnancy.

The trial was bifurcated. Only liability issues were tried during the first stage. We, therefore, make no findings on the issue of damages at this time.

The court adopts the parties' undisputed facts as part of its findings of fact.

## II. FINDINGS OF FACT

The court makes the following findings of fact based upon the testimony and exhibits[4] presented at trial. Incorporated in the court's findings are facts the parties have stipulated to be correct. (See the parties' statement of undisputed facts, filed April, 1991.)[5]

### A. *Background*

1. Both parties reside, or have a place of business, in the Middle District of Pennsylvania.

2. John Powell is an automobile dealership engaged in the sale of new and used automobiles and trucks.

3. John Powell hired Gallo as an automobile salesperson on May 4, 1987.

---

1. The Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., ("Title VII").

2. Although Gallo alleges in the pleadings that she was annoyed by off-color remarks and inappropriate conduct perpetrated by her male co-workers, she advised the court during the bench trial that she is not pursuing a hostile environment claim under *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 64–69, 106 S.Ct. 2399, 2404–07, 91 L.Ed.2d 49 (1986) and its progeny.

3. 43 Pa.S.A. §§ 951 et seq.

4. Along with the testimony, the court also considered the exhibits admitted into evidence.
Plaintiff's exhibits admitted into evidence were:
(a) P–6—disability certificate from Dr. Shu;
(b) P–13—Gallo's time records;
(c) P–17—personnel records for Tony Cashera, salesperson;
(d) P–25—personnel records for Halstead, salesperson;
(e) P–48—personnel records for Tempesco;
(f) D–11—Isaac personnel records; and
(g) D–12—List of salespersons terminated by the dealership.
Defendant's exhibits admitted into evidence were:
(a) D–4—Gallo's work schedule;
(b) D–8—Service records for the used Volvo driven by Carol Gallo in June, 1988;
(c) D–11—Isaac personnel records; and
(d) D–12—List of salespersons terminated by the dealership.

5. Those findings which the parties have stipulated to be correct are stated in paragraphs: 1–12, 15–17, 19, 27–28, 30–31, 33–39, 55, 59, 61, 64, 68–72, 76–77, 84–86 and 94.

4. Gallo was hired by William Struncis, the General Sales Manager at John Powell.

5. Struncis was Gallo's immediate supervisor throughout her tenure at the dealership.

6. Struncis based his decision to hire Gallo on her previous sales experience and on his impression that she would perform satisfactorily.

7. When Gallo was hired, and throughout her term of employment at John Powell, she was the only female salesperson.

8. When Gallo was hired, John Powell employed twelve male salespersons.

9. As of the date Gallo was terminated, John Powell employed nine male salespersons, eight of whom had been so employed when she was hired.

10. During her term of employment, the number of salespersons at John Powell fluctuated between thirteen and nine.

11. Gallo was terminated by John Powell on June 23, 1988.

12. Gallo was compensated on a commission basis and received a percentage of the profit for each vehicle which she sold.

13. During her job interview, Struncis told Gallo that the other salespersons, all men, were competitive and that some of them might object to her employment because she was a woman.

14. Salespersons compete with one another for customers who telephone the dealership and who walk on the lot and are not pre-existing customers of other salespersons.

15. From June to December, 1987, Gallo's performance as a salesperson was very good and her sales figures exceeded the average.

16. Gallo was a very competent and aggressive salesperson.

17. Struncis encouraged Gallo and "loved" her aggressive sales tactics.

18. Some John Powell salesmen regarded Gallo as too aggressive and complained about her aggressiveness to Struncis.

19. Struncis told male salespersons that they should be more aggressive.

20. Salespersons at the dealership routinely worked twelve to thirteen hours per day, generally from 9:00 a.m. to 9:00 p.m., five days a week. Wednesdays the workday ended at 5:00 p.m. when the dealership closed.

21. Dealership employees sometimes played pranks on their co-workers. Standard pranks included tampering with an employee's telephone or leaving a phony message. Pranks of this nature were played on Gallo, and on other employees, male and female alike.

B. *Harassment of Gallo by male employees*

22. Throughout her employment at John Powell, some of the salesmen with whom Gallo worked made rude, cynical and sexist remarks about her ability to perform the job effectively. Sometimes these remarks were made in the presence of customers and/or other dealership employees.

23. On one occasion, when Gallo sold a truck, she was asked by a male salesperson, in a suggestive manner, what she "had to do" to make the sale.

24. On another occasion, a salesman remarked to Gallo that she must have an appointment with a male customer that day, because she was wearing an "extra tight sweater."

25. On yet another occasion, a salesman told Gallo that she did not belong at the dealership and should be home cooking for her husband.

26. One salesman, Dave Johnson called Gallo a "fat bitch" in front of customers because he mistakenly thought she was improperly talking to a former customer of his.

27. On one occasion, when Gallo attempted to obtain a vehicle about which her customer had inquired, she was repeatedly told that it was in "clean-up". Gallo relayed this information to Struncis, who then contacted clean-up personnel and was told that the vehicle had never been sent to them. Gallo then received a telephone call from the customer, who told her another John Powell salesperson, Donald Isaacs,

had approached her (the customer) and told her not to buy the vehicle from Gallo, but to purchase it from him instead, because he could give her a much better deal and could get the vehicle to her "right now."

28. Isaacs' interference with Gallo's potential sale was a very serious matter known in the automobile sales business as "cutting another salesperson's throat."

29. Initially, when such incidents occurred, Gallo would report them to Struncis. Struncis' standard response was that he would look into the matter, or talk to the individual involved.

### C. Gallo's pregnancy

30. In approximately December, 1987, Gallo learned that she was pregnant. Shortly thereafter, she informed Struncis.

31. Gallo informed Struncis that she intended to continue working and planned to return to work six weeks after the birth of the baby.

32. Gallo never deviated from her intention to return to work at John Powell after the birth of her baby.

33. Gallo also informed Struncis that she may, at times, require time off from work due to her age (41) and possible complications with the pregnancy.

34. Struncis stated, in response, that he would not require a doctor's excuse from Gallo for each such absence, but that she should tell him in advance when she would be out.

35. Gallo was absent from work from time to time during the winter/spring of 1988 because of her pregnancy.

36. On each such occasion, she told Struncis in advance, and he approved the absence.

37. On or about June 9, 1988, Gallo received a disability certificate (Plaintiff's exhibit 13) from her physician indicating that, due to her pregnancy and related complications, she should not work more than forty hours per week until after the birth of the baby.

38. Gallo gave the disability certificate to Struncis.

39. Struncis placed Gallo on a forty-hour per week schedule.

40. During at least the first six months of her employment at John Powell, Gallo had a good relationship with Struncis and she considered him a friend and an ally who gave her tips on becoming a better salesperson. After Gallo informed Struncis of her pregnancy, the tenor of their relationship changed. He became less open and congenial with her.

### D. Continuing harassment

41. Harassment, in the form of offensive and sexually discriminatory remarks continued into the spring of 1988.

42. In December, 1987, after Struncis knew of Gallo's pregnancy, Struncis instructed her to go the attic to retrieve a Christmas tree and boxes of decorations. Gallo told him that she would not do this because the access way to the attic was difficult to maneuver, the boxes were heavy and her physician had told her not to lift heavy objects.

43. Gallo stated, however, that she would decorate the tree if someone else would retrieve the tree and the boxes. When Gallo told Struncis this, he swore at her and walked out of her office.

44. On another occasion, in February, 1988, Chet Schick, a salesman, made disparaging remarks to her to the effect that he hoped she did not think she could get out of helping to clean the snow off of cars merely because she was pregnant. After she spent most of the morning engaged in this task, he taunted her and made some remark to the effect that only a pregnant woman would be stupid enough to do what she had done.

45. On another occasion, Danny Myers physically grabbed Gallo by the arm in the showroom and shoved her into a chair. An onlooker, Dave Johnson (a salesman), laughed and said that he thought this was the funniest thing he ever saw.

46. During Gallo's tenure at the dealership, she never saw a male employee manhandled in this fashion.

47. At some point during the winter/spring of 1988, Struncis told Gallo not to bother him any more by coming to him with complaints about harassment by the salesmen and added that she should be used to them by this time.

### E. *Gallo's health problems*

48. Gallo suffered a host of health problems related to her pregnancy. She suffered from headaches, badly swollen ankles, high blood pressure, toxemia, dizziness, a mild form of diabetes, severe pelvic pressure and problems related to the weakness of her abdominal muscles.

### F. *Tent sale*

49. The dealership held a tent sale during the week of June 8, 1988. Temperatures hovered in the nineties. Struncis exempted Gallo from working at the tent sale and scheduled her to work at the dealership instead. At least one other salesperson was assigned to work at the dealership during the tent sale. This imposed no hardship on the dealership since it needed salespersons on duty there in any event. Some salesmen resented the fact that Gallo was assigned to work at the dealership while they had to work at the tent sale and complained to Struncis.

### G. *Leave benefits*

50. Sometime during the spring of 1988, Gallo had a conversation with Struncis about the benefits to which she would be entitled while she was on maternity leave. Gallo was told she was entitled to receive a disability benefit of $56.00 per week.

51. Gallo expressed concerns that this amount would be inadequate to meet her expenses, and Struncis suggested that she contact the Pennsylvania Unemployment Bureau to find out whether she could collect benefits while on maternity leave.

52. Gallo followed his suggestion and learned that she could not collect unemployment compensation benefits unless she was "laid off" by her employer due to lack of work.

53. Gallo asked Struncis whether she could be laid off so that she could collect the benefits, and Struncis told her to speak with George Powell.

54. Powell told Gallo that he would not lay her off so that she could collect benefits because there was work available for her and because any benefits that were paid to her would be charged against the dealership.

### H. *Demonstrator vehicles*

55. Salespersons at John Powell are given new and used demonstrator vehicles for their personal and business use.

56. Demonstrators are typically new vehicles in the dealer's inventory. However, toward the end of the model year (summer and early fall), new vehicles tend to be in short supply. Therefore, rather than reduce the sale value of remaining new vehicles, the dealership assigns salespeople used vehicles to use as demonstrators until the arrival of the new model year cars.

57. Whether salespersons are assigned a new or a used model can also depend on several other factors. If a salesperson is assigned a new demonstrator, that vehicle is "parked" when the milage reaches 5,000. If a salesperson has more than two parked demonstrators, he or she is assigned a used demonstrator until the parked vehicles are sold.

58. During the summer of 1988, salespersons were not being assigned new demonstrators because new vehicles were in short supply.

59. When a salesperson's demonstrator has been sold, the salesperson is entitled to receive another demonstrator.

60. Both of Gallo's parked demonstrators were sold at the June, 1988 tent sale.

61. By June, 1988, Gallo had been driving used demonstrators for quite some time, and asked Struncis whether she was due to be assigned a new model.

62. Her request was prompted by the sale of her two parked demonstrators at the June, 1988 tent sale and by the assignment of a new demonstrator to another salesman which she interpreted to mean

that the "freeze" on assignment of new demonstrators had been lifted.

63. Struncis was leaving on a business trip in a few days and told Gallo that they would discuss the matter when he returned.

64. During the week of June 20, 1988, Struncis was away from the dealership for several days.

65. Struncis also told Gallo to look around the lot while he was gone and select a new model she would like to have assigned to her.

66. It was reasonable for Gallo to assume, based on her conversation with Struncis, that he intended to assign her a new demonstrator when he returned.

67. A new car was the only type of car Struncis could have assigned her, since assignment of used demonstrators is subject to the approval of Danny Myers.

68. In Struncis' absence, Danny Myers, Manager of Used Car Sales, was Gallo's immediate supervisor.

I. *Absence on June 20 and 21, 1988*

69. Gallo left for the New Jersey shore on Saturday, June 18, 1988, and returned home Sunday evening.

70. While on the trip, Gallo experienced mechanical difficulties with the John Powell demonstrator she was operating, a 1983 or 1984 Volvo. She had the car checked by a mechanic who told her that there was a slow transmission leak.

71. On Monday, June 20, 1988, Gallo awoke with a severe sunburn on her feet and ankles.

72. She contacted the emergency room at Divine Providence Hospital in Williamsport, Pennsylvania and was told that she should keep her feet elevated and should not work. Gallo also contacted her physician.

73. After receiving this advice, Gallo phoned the dealership and told them that she could not come to work and explained her condition.

74. She spoke with either Struncis or Myers, and they did not raise any objection to her taking the day off or question her reason for doing so.

75. Gallo's condition had not significantly improved by Tuesday morning, and she again phoned the dealership and told them that she was unable to work that day.

76. Gallo returned to work on Wednesday, June 22, 1988.

77. Struncis still had not returned from his trip, and Myers was the manager on duty.

78. Myers was annoyed when Gallo told him about the problems she had experienced with the Volvo. He told her that he was "tired" of salespeople putting milage on his used cars, making it more difficult for him to sell them. Gallo told Myers about her conversation with Struncis regarding the assignment of a new demonstrator to her. Myers then told Gallo that she may as well take a new demonstrator now, since Struncis was scheduled to return the following day. Myers told her to select a new model she wanted. Gallo told him that she would take a Chevrolet Z–24, a model well-represented on the lot.

79. If a salesperson has the permission of the manager on duty, taking a demonstrator off of the lot is not a violation of company policy.

80. Myers signed a slip so that Gallo could have a Z–24 washed and fueled and told her that she could take the car.

81. Gallo knew that Struncis had the final authority over assignment of the demonstrator to her, and for that reason, did not have it transferred to her name in the dealership records maintained so that the dealership can always ascertain the status and whereabouts of every vehicle in its inventory.

82. Before taking the car home that evening, Gallo checked dealership records to make sure that the vehicle had not been sold. It was not listed as "sold".

83. The following day, Thursday, June 23, 1988, was Gallo's scheduled day off.

84. On June 23, 1988, Struncis telephoned Gallo and told her that the demonstrator which she then had, a Chevrolet

Z–24, had been sold and that he needed it back on the lot as quickly as possible.

85. Gallo returned the Z–24 to the lot on June 23, 1988.

## J. *Gallo's termination*

86. Gallo was terminated from her job on June 23, 1988.

87. When Gallo arrived at the dealership, she went to Struncis' office to tell him that the Z–24 was back on the lot.

88. Struncis ushered her in, closed the door, told her to be seated, and stated that she was terminated.

89. Struncis told her that he was tired of listening to complaints from the other salespersons about Gallo getting time off due to her pregnancy. He then leaned over his desk and asked rhetorically, why she had let herself get pregnant, stating that she had a "good thing" until she got pregnant. He added that he would never hire another woman or a black. Struncis also told Gallo that she was sadly mistaken if she thought she could collect unemployment benefits, because the dealership had never paid unemployment compensation and would never do so.

90. The main reasons later given by Struncis for his termination of Gallo were not mentioned to her during this conversation. Struncis did not mention her absence on Monday and Tuesday of that week or her signing out the Z–24, nor did he ask her for an explanation or justification for her conduct.

91. Gallo then went to her office and began packing her belongings. While she was engaged in this task, Struncis leaned in to her office at one point and made some comment about her "waddling" around the showroom.

92. Gallo did not take up the matter of her termination with George Powell or anyone else at the dealership.

93. When she was terminated, Gallo received a week's vacation pay for vacation time to which she was entitled but had never taken.

94. After she cleaned out her office, one of John Powell's employees drove her home.

## K. *Gallo's performance*

95. Gallo was never warned that she was taking excessive time off or that her job was in jeopardy. She had never received a written or a verbal warning that she had violated any policy or rule of the company or that her performance was substandard.

96. The only criticism Gallo ever received from Struncis were remarks in the nature of constructive criticism, e.g, reminders that it was good practice to keep a follow-up file of customers to send thank-you notes to customers, etc. and that she should make more of an effort to do these sorts of things.

97. There is no evidence that Gallo had ever been derelict in her duties on the job.

## L. *Gallo's alleged absenteeism*

98. During the period from April 28 to June 15, 1988, Gallo missed a total of four and one-half days of work, excluding the two days she missed due to sunburn, June 20 and 21, 1988.

99. During the period from January 1, 1988 through June 15, 1988, Gallo missed a total of eight days from work due to illness.

100. Aside from her absences for medical reasons, Gallo did not take time off when she was scheduled to work. Nor did she take excessively long breaks for meals.

101. Due to their exceedingly long workday, salespersons had some flexibility in setting the length of their meal breaks and followed an informal policy of cooperating with each other and covering for each other so they could attend to some personal matter during the evening.

102. Over the years, salesmen have taken extended leaves of absence due to chronic health problems such as a back condition or a heart condition. Those salesmen were not terminated as a result of the absences.

M. *Dealership practices in terminating other employees*

103. Other salesmen terminated by John Powell in recent years were terminated for serious and repeated infractions of company policy, and/or in at least one instance, violating state law.

104. One salesman was terminated because he destroyed a dealership vehicle while driving under the influence of alcohol.

105. Another was terminated for lying on his employment application by stating that he had a valid driver's license and for operating dealership vehicles without a license.

106. Another was terminated for below average sales. He had been warned previously about his excessive absenteeism, but was discharged because of his poor sales performance.

107. Only one salesman was terminated for excessive absenteeism and that was after he had been warned more than once about this practice.

108. Another salesman, Donald Isaacs, was not terminated despite a serious ethical violation, i.e. attempting to take Gallo's customer. The dealership's primary reason for not terminating Isaacs, despite the seriousness of his conduct, was that this was his first offense. Isaacs received a written warning for his misconduct.

## III. CONCLUSIONS OF LAW

1. This Court has jurisdiction over plaintiff's Title VII claim (Count I), pursuant to 42 U.S.C. § 2000e–5(f)(3) and 28 U.S.C. § 1391.

2. This Court has jurisdiction over plaintiff's Pennsylvania Human Relations Act claim (Count III) as a pendent claim arising out of the same set of operative facts as Count I.

3. Venue in this district is proper, since Gallo is a resident of the Middle District of Pennsylvania, was employed in this district and was terminated here. 42 U.S.C. § 2000e–5(f)(3) and 28 U.S.C. § 1391(c).

4. Gallo was an employee of John Powell within the meaning of 42 U.S.C. § 2000e(f) and 43 P.S. § 954(c).

5. John Powell was an employer of Gallo within the meaning of 42 U.S.C. § 2000e(b) and 43 P.S. § 954(b).

6. The decision rendered by the Pennsylvania Unemployment Compensation Referee Edsell finding that Gallo was not discharged for "willful misconduct" has no collateral estoppel effect on Gallo's Title VII claim.

7. Gallo has satisfied all statutory prerequisites for bringing this action.

8. The issues raised in Gallo's unemployment compensation proceedings are not identical to those presented in a PHRA claim.

9. Gallo made out a *prima facie* case of sex and pregnancy discrimination by showing that she was fired from a job for which she was qualified while salesmen were treated more favorably.

10. Because plaintiff made out her prima facie case, the burden of going forward with the evidence shifted to the defendant to articulate a legitimate, non-discriminatory reason for discharging her.

11. Defendant John Powell articulated a non-discriminatory reason for Gallo's discharge: her alleged excessive absenteeism during the two months prior to her termination and her use of a new demonstrator while Struncis was away from the dealership.

12. The burden of going forward shifted back to the plaintiff and merged with the plaintiff's ultimate burden to prove by a preponderance of the evidence that the dealership's articulated reasons were not the true reasons for the discharge, but merely a pretext for sex or pregnancy discrimination, that is, that the dealership intentionally discriminated against her.

13. Gallo met this burden by showing that similarly situated male employees were not treated in the same manner she was treated, i.e. were not discharged for similar conduct; by showing that the only male salespersons discharged during approximately the same time period were

guilty of far more serious misconduct than that of which she was accused; and by showing that the dealership's articulated reasons for her discharge were pretextual.

14. Gallo has shown that the defendant's proffered explanation is unworthy of credence.

15. Plaintiff has proven sex and pregnancy discrimination under both Title VII and the Pennsylvania Human Relations Act.

## IV. DISCUSSION

### A. *Evidentiary issues*

Preliminarily we will explain our rationale for ruling as we did on two evidentiary issues which arose prior to trial, the first being our ruling on the Danny Myers affidavit. The court excluded from evidence an affidavit by Danny Myers (D–10) proffered by defendant, which purportedly relates Myers' June 22, 1988 conversation with Gallo about assignment of the new Z–24 demonstrator to her. Myers died as the result of an automobile accident in October, 1988, and defendant sought to introduce his affidavit on the ground that it was not hearsay, i.e. that it was offered not for the truth of the matter asserted, or, in the alternative, that it is an exception to the hearsay rule under Fed.R.Evid. 804(b)(5). The court finds both reasons inapplicable for several reasons.

■ Despite defendants' protestations to the contrary, the content of the affidavit goes to the heart of an issue in this case. Defendant's articulated reason for Gallo's alleged termination was her alleged insubordination in disregarding instructions from Struncis that she wait until he returned from his business before getting another demonstrator. The affidavit covers the most critical aspect of that issue— what was said in Gallo's conversation with Myers when he authorized her to take out the Z–24. We, therefore, find implausible defendants' argument that the affidavit is offered not for that purpose, i.e. to establish the veracity of the statements contained therein, but merely to show why a

particular course of action was followed, i.e. why Struncis fired Gallo.

■ We reject defendant's second argument as well. The affidavit does not have sufficient indicia of trustworthiness to qualify as a Rule 804(b)(5) exception. Rule 804(b)(5) provides:

A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as an evidence of the material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable effort; and (C) the general purposes of these rules and the interests of justice will be best served by the admission of the statement into evidence.

Myers affidavit is not dated, and information about the circumstances surrounding its execution is sketchy. Defense counsel stated at trial that he could not reveal the circumstances surrounding its preparation without risking a breach of attorney/client privilege. Counsel was able to tell the court only that the handwritten affidavit is in his (counsel's) handwriting, not Myers. He was unable to state whether the affidavit was in Myers own words.

Absent more information which can satisfy us that the affidavit is in Myers' own words and is his best recollection of exactly what was said between him and Gallo, there is insufficient indicia of trustworthiness to admit the affidavit.

### B. *Preclusive effect of unemployment compensation board ruling*

Plaintiff argues that this court should give preclusive effect to the ruling of the Pennsylvania Unemployment Compensation Board that Gallo was not guilty of willful misconduct in connection with her termination. We find that the ruling is not entitled to preclusive effect in a federal action filed under Title VII.

■ With respect to plaintiff's Title VII claim, the law on this issue is clear. In

*University of Tennessee v. Elliott,* 478 U.S. 788, 796, 106 S.Ct. 3220, 3225, 92 L.Ed.2d 635 (1986), the United States Supreme Court held that Congress did not intend to give preclusive effect in Title VII cases to judicially unreviewed findings of a state agency. See also: *Caras v. Family First Credit Union,* 688 F.Supp. 586 (D.Utah 1988) and *Jones v. Progress Lighting Corp.,* 595 F.Supp. 1031 (E.D.Pa.1984) (state FEP decision not a bar to a Title VII action). Cf. *Pittman v. LaFontaine,* 756 F.Supp. 834, 844 (D.N.J.1991), (Administrative agency determination of the New York State Division of Human Rights which was appealed and affirmed in all respects given preclusive effect.)

■ Plaintiff's argument that collateral estoppel applies to her PHRA claim (Count III) requires more analysis. Federal courts hearing pendent state claims must apply state law and accord a state administrative agency determination the same preclusive effect courts of that state would accord. *Caras, supra.*

■ Four elements are required under Pennsylvania law for collateral estoppel to apply:

> (1) The issue decided in the prior adjudication must be identical to the one now before the court;
>
> (2) There must be a final judgment on the merits;
>
> (3) The parties must be the same or in privity; and
>
> (4) The parties must have had a full and fair opportunity to litigate the issue on the merits.

All four elements must be present. *Kelley v. TYK Refractories Co.,* 860 F.2d 1188, 1194 (3d Cir.1988) and *Frederick v. American Hardware Supply Co.,* 384 Pa.Super. 72, 557 A.2d 779 (1989), *alloc. denied,* 523 Pa. 636, 565 A.2d 445 (1990), citing *Shaffer v. Pullman Trailmobile,* 368 Pa.Super. 199, 533 A.2d 1023, 1026 (1987).

> The application of ... collateral estoppel is not precluded merely because administrative proceedings are involved. When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which

the parties have had an adequate opportunity to litigate, the court will not hesitate to apply res judicata principles.

*Frederick, supra,* 557 A.2d at 780. Therefore, application of collateral estoppel is not precluded solely because the issues were previously litigated before the Unemployment Compensation Board. *Frederick, supra,* 557 A.2d at 780.

■ The issues decided by the Unemployment Compensation Board were not the same as those before this court. The issue before the Board was whether Gallo had been discharged for willful misconduct, defined by the Pennsylvania courts as, "an act of wanton or willful disregard of the employer's rules, a disregard of the standards of behavior which the employer has a right to expect of an employee, or the negligence indicating an intentional disregard of the employer's interests or of the employee's duties and obligations to the employer. The employer bears the burden of proving willful misconduct connected with the claimant's work. *Frederick, supra,* 557 A.2d at 780–81.

In the PHRA action, the issue is whether the plaintiff was discharged due to her gender or due to her pregnancy, and she bears the burden of persuading the court that she was the object of intentional discrimination. The issues are clearly not identical, and collateral estoppel therefore does not apply. See generally: *Johnson v. University of Wisconsin,* 783 F.2d 59 (7th Cir.1986) (Unemployment agency finding of no misconduct did not have collateral estoppel effect in an age discrimination action, since the claims are not identical); *Nickens v. W.W. Grainger, Inc.,* 645 F.Supp. 569 (W.D.Mo.1986) (Unemployment agency finding of no misconduct did not have collateral estoppel effect in a section 1981 action, since the issues are not identical); *City of Reading v. Labor Relations Board,* 130 Pa.Cmwlth. 397, 568 A.2d 715 (1989) and *Commonwealth of Pennsylvania, Pennsylvania State Police v. Unemployment Compensation Board of Review,* 135 Pa.Cmwlth. 71, 578 A.2d 1360 (1990). Cf. *Frederick, supra,* (Unemployment Compensation Board ruling that

plaintiff had engaged in willful misconduct collaterally estopped plaintiff from litigating wrongful discharge claim.)

### C. Gallo's Title VII claim, PHRA claim and evidence of discriminatory intent

Title VII makes it unlawful for an employer to discharge or otherwise discriminate against an employee with respect to compensation, terms and conditions of employment, or benefits because of the person's sex. 42 U.S.C. § 2000e-2(a) (1988). An amendment, the Pregnancy Discrimination Act of 1978 specifically defines discrimination on the basis of pregnancy, childbirth, or medical conditions related to pregnancy as unlawful sex discrimination under Title VII. 42 U.S.C. § 2000e(k) (1988).

■ To prevail on a claim of sex discrimination under Title VII, a plaintiff must first make out a *prima facie* case by showing (1) that she is within a protected class; (2) that she was qualified to perform the job she held; and (3) that she was discharged. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the defendant articulates a legitimate non-discriminatory reason for the discharge, any presumption of discrimination drops from the case. *Burdine, supra,* 450 U.S. at 254–55, 101 S.Ct. at 1094–95.

■ Claims of pregnancy discrimination filed under the PHRA are analyzed under the *McDonnell Douglas/Burdine* formula and employ federal case law in their construction of the Act. *Talluto v. RCA*, 743 F.Supp. 346, 348 (M.D.Pa.1989), (Conaboy, J.), citing, *inter alia, General Electric Corp. v. Pennsylvania Human Relations Commission*, 469 Pa. 292, 365 A.2d 649, 654–57 (1976). Discrimination based on pregnancy constitutes sex discrimination, not handicap discrimination, under the PHRA. *Cerra v. East Stroudsburg Area School District*, 450 Pa. 207, 299 A.2d 277 (1973) and *Dallastown School District v. Pennsylvania Human Relations Commission*, 74 Pa.Cmwlth. 560, 460 A.2d 878 (1983).

■ Plaintiff's burden is a "but for" test whereby she must show that her gender and/or her pregnancy was a reason for her discharge. *Bellissimo v. Westinghouse Electric Corp.*, 764 F.2d 175 (3rd Cir.1985) *cert. denied*, 475 U.S. 1035, 106 S.Ct. 1244, 89 L.Ed.2d 353 (1986). Plaintiff is not required to prove that the discriminatory reason was the determinative factor, "but only that it was a determinative factor." *Bellissimo, supra*, 764 F.2d at 179 n. 1, citing *Smithers v. Bailar*, 629 F.2d 892, 899 (3d Cir.1980). "More than one 'but for' cause can contribute to an employment decision, and if any one of those determinative factors is discriminatory, Title VII has been violated." *Bellissimo, supra*, 764 F.2d at 179 n. 1. A plaintiff may meet her burden directly, by persuading the court it is more likely than not that her termination was motivated by a discriminatory reason, or indirectly, by showing that the defendant's proffered explanation is unworthy of credence. *Burdine, supra*, 450 U.S. at 257, 101 S.Ct. at 1095 and *Williams v. Giant Eagle Markets, Inc.*, 883 F.2d 1184, 1192 (3d Cir.1989).

■ "A discharge is not per se disparate treatment. It violates Title VII's commands only if it is made on a basis that would not result in the discharge of a male employee." *Bellissimo, supra*, 764 F.2d at 180, citing *Moore v. City of Charlotte*, 754 F.2d 1100, 1106, 1110 (4th Cir.1985). Title VII does not protect employees from harsh or unfair employment actions or mistakes but only from employment actions based on unlawful considerations such as gender or pregnancy. *Hawkins v. Ceco Corp.*, 883 F.2d 977 (11th Cir.1989) and *Pollard v. Rea Magnet Wire Company, Inc.*, 824 F.2d 557, 560 (7th Cir.1987), *cert. denied*, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1988) and *Charles Jacquin & Cie;*, 48 FEP Cases 795, 803, 1988 WL 111984 ((E.D.Pa. Oct 20, 1988), *aff'd sub nom, Trail v. Charles Jacquin Et Cie, Inc.*, 884 F.2d 1385, (3rd Cir. 1989). "The implementation of neutral rules does not constitute racial discrimination." *Miller v. Yellow Freight Systems, Inc.*, 758 F.Supp. 1074, 1079 (W.D.Pa.1991) (Smith, J.)

■ Gallo proved by a preponderance of the evidence that the reasons Struncis

advanced for terminating her were a mere pretext. Viewed as a whole, the evidence showed both that the proffered reasons were not credible and that Gallo's sex and her pregnancy more likely than not played a role in Struncis' decision to terminate her employment.

At trial, Struncis stated three main reasons for Gallo's termination: (1) her insubordination in taking the Z–24 when he had told her that they would discuss her receiving a new demonstrator when he returned; (2) her excessive absenteeism over the previous two months; and (3) her absence on June 20 and 21 due to a case of severe sunburn, which he characterized as "the last straw." He did not voice any of these reasons to Gallo when he terminated her employment.[6] It was not until several months later, at the unemployment compensation hearing, that Struncis voiced these reasons. The fact that they were not stated to Gallo when she was terminated casts doubt on their authenticity and suggests that they were fabricated after the fact to justify a decision made on other grounds.

Other factors coalesce to reinforce this impression. Chief among them is that the reasons given by Struncis do not stand up under close scrutiny. He claimed that he considered Gallo insubordinate in taking the Z–24 off of the lot without his authorization. Although insubordination is a legitimate nondiscriminatory reason for termination, *Brown v. Delta Air Lines Inc.*, 522 F.Supp. 1218 (S.D.Tex.1980), *aff'd* 673 F.2d 1325 (5th Cir.1982), the facts do not support Struncis' claim. We do not believe he could have reasonably concluded she was insubordinate in acting as she did. By defendant's admission, Gallo had secured authorization from Myers, the manager in charge in Struncis' absence, to take the Z–24. Although Struncis claimed that Gallo had obtained Myers' authorization by misrepresenting his statements to her, he admitted, on cross-examination that Gallo could reasonably have concluded that

Struncis would assign a new demonstrator to her when he returned. Struncis' claim that she was terminated due to excessive absenteeism and abuse of her situation also crumbles on close examination. Gallo's time sheets (P–13) reveal that she was absent from work six and one-half days during her last two months of employment. Under any reasonable standard, this would not be considered excessive, particularly in view of the many complications she was experiencing with her pregnancy.

Moreover, the dealership had an informal policy of allowing an employee experiencing health problems to take an extended leave of absence. The fact that Gallo was not given this same opportunity, and was instead terminated when health problems interfered with her work schedule, suggests both that her absences from work were not the real reason for her termination, and that she was singled out for harsher treatment than similarly situated male employees.

Gallo was treated differently from the male employees in other ways as well. Other salesman who committed infractions were not summarily terminated unless the offense was so serious that the dealership could not risk recurrence, e.g., driving a company vehicle under the influence of alcohol and driving without a license. Salesmen who committed infractions similar to Gallo's alleged misconduct received a warning and were given a second chance. See generally: *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir.1989), (evidence showing prior tolerance of infractions by white employees might support inference that new work rule was enforced discriminatorily against plaintiff) and *E.E.O.C. v. Ackerman, Hood & McQueen, Inc.*, 758 F.Supp. 1440 (W.D.Okla.1991) (evidence showing prior tolerance of infractions by white employees might support inference that new work rule was enforced discriminatorily against plaintiff).

---

**6.** Although Struncis' and Gallo's versions of the June 23, 1988 conversation differ, we find her version to be more credible. Gallo's testimony was straightforward. She recounted incidents

in specific detail and did not hedge or equivocate on any question. Her testimony was also consistent throughout.

Struncis' testimony that Gallo's employment was terminated to improve morale is a telling remark that adds to our impression that the proffered reasons were a pretext. When pressed by plaintiff's counsel as to what he meant by that remark, Struncis equivocated and tried to discount its importance, but in our estimation it is a revealing comment on the dealership's true motivation in terminating Gallo. Testimony indicated that other salesmen had complained about Gallo from time to time, about her aggressiveness in seeking out customers, about her exemption from the tent sale, about the time she took off due to complications with her pregnancy, etc, and we interpret Struncis' remark to mean that she was terminated to placate the other salesmen and put an end to these complaints.

Struncis also testified at trial that it was "common knowledge" at the dealership that Gallo wanted to be laid off so that she could collect unemployment benefits while on maternity leave. He suggested that she intentionally tried to irritate him so that he would lay her off. We find this suggestion implausible. The only direct evidence offered to substantiate this purported rumor was testimony by Dave Johnson, a salesman who readily admitted that he did not like Gallo, had never liked her, and did his best to stay away from her and avoid talking to her. Despite these candid admissions, he asked the court to believe that Gallo specifically sought him out one day to tell him that she would see to it that the dealership laid her off. We lend no credence to Johnson' testimony. Everything he said about their relationship belies any conclusion that she would seek him out to relate such intentions, had she harbored them.

Aside from the lack of direct evidence, the suggestion that Gallo sought to be laid off is also implausible as a matter of logic. It would make no sense for Gallo to risk losing, perhaps permanently, a job which she performed well and had hopes of performing with continuing success, to gain additional benefits for the six weeks she would be on maternity leave.

An order will be entered consistent with this memorandum.

### ORDER

For the reasons stated in the accompanying memorandum, it is ORDERED that:

1. Judgment be entered in plaintiff's favor on the issue of liability. Entry of judgment shall be deferred until the conclusion of the entire case.

2. Trial on the damage phase of this case will commence Tuesday, July 2, 1991 at 9:30 a.m. in Courtroom No. 2 of the Federal Courthouse in Williamsport, Pennsylvania.