Carol GALLO, Plaintiff,

v.

**JOHN POWELL CHEVROLET, INC., Defendant.**

**No. CV–90–0937.**

United States District Court, M.D. Pennsylvania.

Dec. 10, 1991.

---

**5.** Plaintiff's amended complaint (record document no. 8) was filed July 30, 1991.

807

John M. Humphrey, Williamsport, Pa., for plaintiff.

Richard H. Roesgen, Williamsport, Pa., for defendant.

## MEMORANDUM

McCLURE, District Judge.

### BACKGROUND

Plaintiff Carol Gallo filed this Title VII action [1] against her former employer, John Powell Chevrolet ("John Powell" or "the dealership"), alleging that she was terminated from her position as an automobile salesperson on June 23, 1988 due to her

---

1. The Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., as amended, ("Title VII"). The court notes the enactment by Congress of the Civil Rights Act of 1991 on November 7, 1991. The 1991 Act makes certain amendments to Title VII applicable to this type of case. However, the Act itself contains no relevant provi- sions as to the applicability of the Act to pend- ing cases. The court has given no consideration as to whether or not the Act should be applied to this case, and has received no request to do so. Suffice it to say that the court has awarded compensatory damages under the Pennsylvania Human Relations Act (the "PHRA") and has

gender and to her pregnancy in violation of Title VII and the Pennsylvania Human Relations Act ("PHRA").[2] She seeks injunctive relief, back pay, punitive damages, attorney's fees and costs. (Plaintiff's complaint, filed May 18, 1990).

Following the first phase of the bifurcated trial, we entered a memorandum and order (Record Document No. 38, filed May 24, 1991) finding in plaintiff's favor on liability. 765 F.Supp. 198. We found that John Powell had violated Title VII and the PHRA in discharging Gallo. Trial of the damage issues was held July 2, 1991.

FINDINGS OF FACT

Based on the testimony and exhibits presented at trial, as well as certain stipulated facts, the court makes the following findings of fact:[3]

*Lost earnings and benefits*

Gallo worked as an automobile salesperson at John Powell from May 4, 1987 to June 23, 1988, the date of her termination. She was compensated solely on a commission basis and received a percentage of the profit for each vehicle which she sold. During the approximately thirteen months she was employed at John Powell, she earned commissions[4] totalling $22,552.21, calculated to an average weekly wage of $357.54 before deductions.

As part of her compensation, Gallo also received benefits in the form of (1) the use of a demonstrator vehicle for her business and personal transportation needs; and (2) Blue Cross/Blue Shield "Plan C" and major medical health insurance coverage. During periods when she was unable to work due to a medical disability, she was entitled to receive a disability benefit of $56.00 per week. (After she left John Powell's employ, this benefit was increased to $100.00 per week.)

Gallo is entitled to back pay from the date of her termination, June 23, 1988, to the date judgment is entered in her favor (the "calculation period").

Calculation of Gallo's back pay award involves more than a straight-line projection of her prior earnings over the three years following her termination.

The earnings of automobile salespersons are affected not only by their individual selling abilities, but also by the economy, the price of vehicles and other extraneous factors beyond the salesperson's control.

Gallo was a competent and aggressive salesperson who, throughout most of her employment at the dealership, earned commissions commensurate with those earned by other John Powell salespersons of comparable experience and ability. Had Gallo continued working at the dealership, she would have continued to perform in a manner commensurate with her prior performance and would have earned commissions approximating those earned by other full-time salespersons with comparable experience.

Only two salespersons have remained full-time employees of the dealership throughout the calculation period, Dave Johnson and Chet Schick. Their earnings over the calculation period, when calculated as a percentage of their earnings during the "base year" (June 1987–June 1988, when Gallo was employed at the dealership) offer the fairest method of projecting the commissions Gallo would have earned had she continued working. The court has determined Schick's and Johnson's combined average earnings, reflected as a percentage of their base year (6/16/87 to 6/15/88) earnings, to be 114.5% of the base year for June 16, 1988 to June 15, 1989, 152% of the base year for June 16, 1989 to June 15, 1990, and 95.5% of the base year for June 16, 1990 to June 15, 1991.

Applying these percentages to Gallo's base year earnings of $18,592.08 produces projected lost earnings for Gallo of $21,-287.93 for the period June 23, 1988 to June

found the evidence insufficient to support a punitive damages award under the PHRA.

**2.** 43 Pa.S.A. §§ 951 to 963.

**3.** We incorporate by reference all findings of fact and conclusions of law stated in our prior order (Record Document No. 38, filed May 24,

1991) which have a bearing on the damage issues now before us.

**4.** Throughout the memorandum, we will use the terms "commissions" and "earnings" synonymously.

22, 1989, $28,259.96 for the period June 23, 1989 to June 22, 1990 and $17,755.14 for the period June 23, 1990 to June 22, 1991. On the basis of projected earnings of $17,-755.14 for the last 12–month period (or $341.45 per week), Gallo also would have earned $8,194.80 for the 24 weeks from June 23, 1991 to December 9, 1991, the date of this memorandum and the accompanying order. These calculations, all of which have been set forth in detail in the Appendix to this memorandum, result in total lost commissions due Gallo of $75,498.13.

As part of her back pay award, Gallo is also entitled to recover the value of the benefits she would have received as a John Powell employee. She is entitled to recover the cost of obtaining comparable health insurance coverage over the calculation period, a total of $4,389.00.[5]

She is also entitled to recover the cost of obtaining the use of a vehicle comparable to the demonstrators she was typically assigned. Reasonable compensation for the loss of the demonstrator is the expense Gallo would have incurred had she attempted to rent a comparable vehicle. Gallo was typically assigned a new vehicle with an average retail price between $18,000 and $20,000, although she was sometimes assigned used vehicles with a lesser retail value. The fairest measure of the compensation due Gallo for loss of the use of a vehicle is the cost of leasing a comparable vehicle. A general rule of reference in the automobile leasing business is that the monthly cost of leasing a vehicle is twice its retail value divided by 100. When we reduce the average value of the demonstrator vehicles assigned to Gallo to $15,000.00 to reflect the fact that she was sometimes assigned used demonstrators, and apply the formula stated above, we find that Gallo is entitled to recover $300.00 per month, or a total of $11,100.00 ($300.00 × 37 months[6] = $11,100.00) for loss of use of a demonstrator. Gallo would not have been entitled to a demonstrator during the eighteen weeks she would have been on maternity leave, and we have reduced the calculation period to reflect that fact.

Had her employment not been terminated, Gallo would have received a disability benefit of $56.00 per week during the ten weeks maternity leave she would have taken for the birth of her daughter, Ashley, born August 26, 1988 (a total of $560.00) and a disability benefit of $100.00 per week during the eight weeks (a total of $800.00) maternity leave she would have taken for the birth of her daughter, Tarel, born July 7, 1990.

Gallo is entitled to a gross back pay award of $92,347.13 inclusive of all fringe benefits and disability payments but exclusive of pre-judgment and post-judgment interest, both of which will be reflected in the final judgment. Her total back pay award, exclusive of interest, and before deductions, is calculated as follows:

| | |
|---|---|
| **PROJECTED LOST COMMISSIONS** | **$75,498.13** |
| ADDITIONS | |
| Disability pay for birth of Ashley | 560.00 |
| Disability pay for birth of Tarel | 800.00 |
| Blue Cross/Blue Shield and Major Medical coverage—premium cost | 4,389.00 |
| Use of demonstrator vehicle | 11,100.00 |
| **GROSS BACK PAY AWARD** | **$92,347.13** |

---

**5.** The parties supplied only one lump sum figure for the cost of health care premiums, so we did not make any calculations or adjustments for the time elapsed between the trial and the date of judgment. Without a breakdown by month of premium costs, we have no basis for adjusting costs to include the time elapsed between trial and judgment.

**6.** There are approximately 41.5 months in the calculation period from June 23, 1988 to December 10, 1991, inclusive, from which 4.5 months have been deducted for the two maternity leaves.

*Deductions from back pay*

Gallo would not have earned any commissions during the ten week maternity leave she would have taken in August–September, 1988 or during the eight-week leave she would have taken in June–July, 1990.

From July 2, 1988 through January 21, 1989, Gallo collected Pennsylvania unemployment compensation benefits of $252.00 per week, totalling $6,253.50. Following her employment at Shirn's, Gallo collected Pennsylvania unemployment benefits of $196.50 per week, totalling $4,912.50.

During the month she was employed at Shirn's, Gallo earned commissions totalling $690.00.

Gallo's back pay award will be reduced by the projected commissions she would not have earned while she was on maternity leave, and by her earnings from Shirn's. Gallo's back pay award will not be reduced by the unemployment compensation benefits she received. Her net back pay award is calculated as follows:

| GROSS BACK PAY AWARD | | $ 92,347.13 |
|---|---|---|
| DEDUCTIONS | | |
| Earnings at Shirn's | $ 690.00 | |
| 1988 maternity leave | 4,093.80 | |
| (10 weeks × $409.38 per week) | | |
| 1990 maternity leave | 2,731.52 | |
| (8 weeks × $341.44 per week) | | |
| TOTAL DEDUCTIONS | | – 7,515.32 |
| NET BACK PAY AWARD | | $ 84,831.81 |

The final judgment will include additional back pay from the date of this order to the date of final judgment calculated at the rate of $416.45 per week. This is based on the most recent projected earnings of $341.45 per week plus $75.00 per week for lost use of a demonstrator vehicle.

*Attempts to secure other employment*

Gallo made reasonable and diligent attempts to secure other employment during the three years following her termination from John Powell. She sent resumes [P–69][7] and employment applications to prospective employers, contacted local employment offices about possible job openings, monitored notices of job openings posted at employment offices, periodically checked "help wanted" advertisements in local newspapers, and consulted friends and family about possible job openings. She has concentrated her efforts on applying for retail sales positions, since nearly all of her work experience lies in that field, although she has applied for other positions as well.

Due to circumstances beyond her control, Gallo has been unable to secure lasting employment in the three years since her termination.

She was successful in obtaining only one job, which lasted just four weeks. She was hired as an automobile salesperson in March, 1989 by a local dealership, Shirn's Auto Mart ("Shirn's"). Due to conditions for which she cannot be faulted, her sales performance was not good, and her employment was terminated there for that reason. Shirn's hired several other sales-

7. Throughout the memorandum, we refer to plaintiff's exhibits as P–1, P–2, etc. and defendant's exhibits as D–1, D–2, etc.

persons at or about the same time Gallo was hired, and the others were likewise terminated either the same day or next day after she was terminated.

Gallo has been involved in only one other endeavor to earn money since her termination. In the spring/summer of 1989, she attempted to start a business of her own, an errand service for shut-ins. She advertised this service in a local newspaper [P–70], but the results were disappointing. She received only one or two responses, and found that it was not economically profitable to run errands for a single customer. Because of the apparent lack of interest in the service she proposed to offer, she abandoned the idea of pursuing this as a business enterprise.

*Reinstatement and expungement*

There are no impediments to Gallo's return to her former position. She has expressed a sincere willingness to return to John Powell's employ and demonstrated while she was there that she is able to perform the job competently and conscientiously even in the face of hostility from her colleagues.

*Emotional distress and egregious conduct by employer*

Gallo was humiliated in front of the other salespersons and told outright by her supervisor, William Struncis, that her pregnancy was the reason for her termination, and that she was "fat" and "waddled" across the showroom floor.

Gallo is entitled to the sum of $500.00 as compensation for her mental anguish and emotional distress caused by her termination and the events leading up to it.

Struncis' conduct toward Gallo, although insensitive at times, was not outrageous or carried out because of an evil motive or reckless indifference on his part to her rights.

DISCUSSION

*Back pay award*

■ An award of back pay is one of the Title VII remedies expressly sanctioned by Congress. Although not mandatory, back pay is routinely awarded to successful Title VII plaintiffs absent a compelling reason to deny it, consistent with the Act's objective of placing the plaintiff in the position she would have enjoyed had there been no discrimination. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Christopher v. Stouder Memorial Hospital*, 936 F.2d 870, 880 (6th Cir.1991); and *Wooldridge v. Marlene Industries Corp.*, 875 F.2d 540, 549 (6th Cir.1989) ("[B]ack pay should always be awarded absent the existence of exceedingly rare special circumstances.").[8]

■ The back pay award encompasses not only lost wages, but also the benefits plaintiff would have received incident to her employment, *Mitchell v. Seaboard System Railroad*, 883 F.2d 451, 452–53 (6th Cir.1989),[9] prejudgment interest calculated

---

**8.** Section 2000e–5(g) provides in relevant part:

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer ... responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate.... Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.

42 U.S.C. § 2000e–5(g).

Although we cast our discussion of the law largely in terms of the back pay under Title VII, it is equally available as a remedy for defendant's violation of the PHRA, and we rest our award of back pay on that ground as well. Section 962(b) of the PHRA provides in relevant part:

> .... If the court finds that the respondent has engaged in or is engaging in an unlawful discriminatory practice charged in the complaint, the court shall enjoin the respondent from engaging in such unlawful discriminatory practice and order affirmative action which may include, but is not limited to, reinstatement or hiring of employees, granting of back pay, or any other legal or equitable relief as the court deems appropriate.

43 P.S. § 962(c). See also: *Cain v. Hyatt*, 734 F.Supp. 671, 685 (E.D.Pa.1990).

**9.** See also: *Kelly v. Matlack, Inc.*, 903 F.2d 978, 984 (3d Cir.1990) (ADEA case).

at the prevailing IRS prime rates as set forth in section 6621(b) of the Internal Revenue Code, and post-judgment interest, also calculated by using the IRS prime rates. *Loeffler v. Frank*, 486 U.S. 549, 557–58, 108 S.Ct. 1965, 1970–71, 100 L.Ed.2d 549 (1988); *EEOC v. Guardian Pools, Inc.*, 828 F.2d 1507, 1512–13 (11th Cir.1987); and *Maturo v. National Graphics, Inc.*, 722 F.Supp. 916, 930 (D.Conn.1989).

■ Periods during which the plaintiff would not have worked due to health conditions, pregnancy or for other reasons, are excluded from the calculation period. *Inda v. United Air Lines, Inc.*, 405 F.Supp. 426, 434 (N.D.Cal.1975), *aff'd in part*, 565 F.2d 554, *cert. denied*, 435 U.S. 1007, 98 S.Ct. 1877, 56 L.Ed.2d 388 (1978).

■ Title VII imposes a two-year statutory cap on the amount of back pay awardable, the PHRA a three-year cap. *Bereda v. Pickering Creek Industrial Park, Inc.*, 865 F.2d 49, 54 (3d Cir.1989), citing *Albemarle, supra*, 422 U.S. at 410 n. 3, 95 S.Ct. at 2368 n. 3; 42 U.S.C. § 2000e–5(g) and 42 P.S. § 962(c).[10] Calling this limitation a "cap" is a misnomer. Rather, it states a limit as to the period of time prior to the filing of a complaint for which back pay may be awarded. Thus, a three-year "cap" does not preclude back pay in this case for the period between termination of employment on June 23, 1988 and the date of this memorandum and order, which is a period of approximately three years, five and one-half months. The period from June 23, 1988 to the date of filing the complaint, May 18, 1990, is well within even a two-year "cap".

■ Back pay is awardable even if plaintiff's lost wages are not susceptible of an exact dollar calculation. "Mere difficulty"

in calculating the award does not warrant its denial. *Christopher, supra*, 936 F.2d at 880. Thus, if the plaintiff would have been paid on some basis other than a salary or hourly wage, or if she was denied raises, benefits, promotions, etc. due to discrimination, she can recover for all of those losses even though the court must estimate what she would otherwise have earned and/or the course her career would otherwise have taken. Any uncertainties are resolved against the discriminating employer. "Where it is impossible to reconstruct the employment history of each claimant, back pay equal to the maximum amount which could have been earned but for the discrimination is appropriate." *Wooldridge, supra*, 875 F.2d at 549. In such cases, the courts have typically projected plaintiff's lost earnings by tracking the career of a similarly situated co-worker who was not subjected to discrimination and adjusting for distinctions between the situation of the co-worker and that of plaintiff. See, e.g., *Gunby v. Pennsylvania Electric Co.*, 840 F.2d 1108, 1119–20 (3d Cir.1988), *cert. denied*, 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989) and *Ross v. Buckeye Cellulose Corp.*, 764 F.Supp. 1543, 1547–51 (M.D.Ga.1991).

■ The award is not reduced by unemployment benefits collected by the plaintiff, consistent with the Third Circuit's view that such benefits are collateral and should not be used to reduce defendant's legal obligation to make the plaintiff whole. *Craig v. Y & Y Snacks, Inc.*, 721 F.2d 77, 83 (3d Cir.1983). Cf. *Dillon v. Coles*, 746 F.2d 998 (3d Cir.1984), (If the defendant-employer is the Commonwealth of Pennsylvania, it may deduct unemployment compensation benefits from back pay awards if it would have been entitled to bring a sepa-

**10.** Section 2000e–5(g) provides: "Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the [Equal Employment Opportunity] Commission." 42 U.S.C. § 2000e–5(g).

Section 962(c) tracks the Title VII language, but provides for a three-year cap instead of a two-year cap. It states: "Back pay liability shall not accrue from a date more than three years

rate action under state law to recoup such benefits.) [11]

■ Nor is the award reducible by the federal income tax plaintiff would have paid on the wages she earned. The Third Circuit has not ruled specifically on the issue of whether income taxes should be deducted from back pay, but has ruled on a concomitant issue: whether such awards are subject to federal income tax. In *Rickel v. Commissioner of Internal Revenue*, 900 F.2d 655 (3d Cir.1990), the court ruled that back pay awards are, for taxing purposes, considered to be non-physical personal injury awards, and are, therefore, not taxable. Accord: *Burke v. United States*, 929 F.2d 1119 (6th Cir.1991). Although calculated on the basis of pay, the award is for an injury incurred by tortious conduct, not for breach of contract. Based on the Third Circuit's ruling, and specifically on its comments analogizing back pay awards to personal injury awards,[12] we find that back pay awards are not reducible by the federal income tax which the employee would have paid but for the discrimination. Cf. *Hopkins v. Price Waterhouse*, 737 F.Supp. 1202, 1215 n. 19 (D.D.C.1990) and *Thomas v. County of Fairfax, Va.*, 758 F.Supp. 353, 367 n. 26 (E.D.Va.1991).

■ The award is also reduced by any amounts the plaintiff actually earned or could have earned through the exercise of reasonable diligence. 42 U.S.C. § 2000e–5(g). Plaintiffs have a duty to mitigate damages by seeking suitable employment, and those who fail to carry out this obligation forfeit their right to continuing back pay. *Albemarle, supra* and *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1273–77 (4th Cir.1985). Plaintiffs are not required to seek out or accept any position which may be available. They are not, for example, required to "go into another line of work, accept a demotion, or take a demeaning position," to preserve their right to back pay, *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231–32, 102 S.Ct. 3057, 3065–66, 73 L.Ed.2d 721 (1982), but may not refuse other work simply because it pays less than they might wish or is less desirable than their previous employment. *Ellis v. Ringgold School District*, 832 F.2d 27, 30 (3d Cir.1987) Reasonable diligence, in the context of keeping a new job, means that the plaintiff must have conducted herself "reasonably and responsibly in accordance with employer rules." *Brady, supra*, 753 F.2d at 1277.

■ The burden of proving that plaintiff failed to exercise reasonable diligence in seeking out other employment is on the employer. *Carden v. Westinghouse Electric Corp.*, 850 F.2d 996, 1004–5 (3d Cir. 1988) and *Huegel v. Tisch*, 683 F.Supp. 123, 125 (E.D.Pa.1988). This burden may be satisfied by proving that: (1) substantially equivalent positions were available; and (2) the plaintiff failed to use reasonable care and diligence in seeking such positions. Plaintiff has no obligation to submit evi-

prior to the filing of a complaint charging violations of this act." 43 P.S. § 962(c).

11. A party receiving a back pay award who has received unemployment benefits has an obligation to notify and reimburse the Department of Labor and Industry under Pennsylvania law. Section 874 of the Pennsylvania Unemployment Compensation Law provides:

Notwithstanding any other provisions of this subsection, any person who has received or employer who has made a back wage payment pursuant to an award of a labor relations board arbitrator or the like without deduction for unemployment compensation benefits received during the period to which such wages are allocated shall notify the department immediately of the receipt or payment of such back wage award. The recipient of such back wage award, made without deduction for unemployment compensation benefits received during the period, shall be liable to pay into the Unemployment Compensation Fund an amount equal to the amount of such unemployment compensation benefits received.

43 P.S. § 874(b)(3).

12. The court stated:

... [I]t might be troubling to some that a successful plaintiff in an ADEA suit will make out better, vis-a-vis federal income tax liability, than if the plaintiff had not been discriminated against in the first place. Although this concern is understandable, we note that we are simply following the Treasury regulation that injects into the analysis tort and contract concepts. Moreover, the successful ADEA plaintiff is being treated no better (or worse now) than the typical tort victim who suffers a physical injury ... We see no reason to treat one personal injury victim any differently than another.

*Rickel, supra*, 900 F.2d at 664.

dence of reasonable diligence on her part until defendant has established these elements. *Wooldridge, supra,* 875 F.2d at 548.

### Gallo's back pay award

■ John Powell seeks to limit the accrual of back pay on two grounds. It argues that Gallo did not exercise reasonable diligence in seeking other employment and that she did not exercise diligence in attempting to keep her job at Shirn's. We reject both contentions.

John Powell first had the burden of demonstrating, by a preponderance of the evidence, that comparable positions were available, and that Gallo did not make a diligent effort to seek out such positions. It presented evidence of both. The onus then shifted to Gallo to show that she had made a diligent attempt to find suitable employment.

Gallo testified at length about her three-year search for other employment. She testified credibly that she faithfully read the "help-wanted" advertisements in the local newspaper twice a week, sought information about potential job opportunities from friends, family and local employment offices, submitted applications to potential employers in the area, contacted all of the local car dealerships, and sent out 150 resumes, all to no avail.

■ While it may seem incongruous that all of these efforts have come to naught, Gallo has several strikes against her which undoubtedly made her search more difficult: her somewhat limited background (almost all of her prior experience is in retail sales) and the limited availability of retail sales jobs in this geographic area, other than the minimum-wage or part-time variety, which would have been a considerable step down from her selling position at John Powell. Although she would have stood a better chance of success had she not limited her search to the immediate geographic area, her reluctance to relocate is easily understood—her husband is employed here, and she has two small children

to care for. We do not read Title VII to require a plaintiff to relocate when no jobs are available in her area, if moving would work a substantial hardship on her or her family. *Ford, supra,* 458 U.S. at 231–32, 102 S.Ct. at 3065–66. Cf. *Ellis, supra,* 832 F.2d at 30 (Plaintiff's "failure to explore several obvious avenues to employment" limited her right to back pay.)

We are equally unpersuaded by John Powell's argument that Gallo did not make a diligent effort to retain her job at Shirn's. The fact that she was let go after such a short time, a mere four weeks (at least one of which was spent in training and orientation exercises), strongly suggests that factors other than her performance weighed into Shirn's decision to let her go. This impression is reinforced by the fact that other employees were hired at about the same time that Gallo came on board, and were also discharged the same day she was or the day after. Moreover, there was no testimony that Gallo was terminated because she violated company policy or willfully failed to live up to the standards Shirn's expected of her.

Gallo's only other endeavor to earn money was the errand service she attempted to start. Had she earned a profit, it would be offset against her back pay award. There was no testimony about the amount she earned, but she testified, without contradiction, that she had only one customer and was probably spending more on gasoline than she was earning. We therefore find that any income she derived from the errand service was inconsequential, and for that reason need not be offset against her back pay award.

### Reinstatement and expungement of personnel records

■ The courts have considerable latitude in fashioning appropriate remedies for Title VII and PHRA violations. Of the available remedies, the courts have two options to provide relief for future harm: (1) order plaintiff's reinstatement, or hiring, as the case may be, or (2) award front pay.[13] *Franks v. Bowman Transporta-*

---

**13.** Front pay is:

an equitable award for a reasonable future

period required for the victim to reestablish

*tion Co.,* 424 U.S. 747, 763–64, 96 S.Ct. 1251, 1263–64, 47 L.Ed.2d 444 (1976); *Albemarle, supra,* 422 U.S. at 419, 95 S.Ct. at 2372; and *Gunby, supra,* 840 F.2d at 1122. 42 U.S.C. § 2000e–5(g) and 43 Pa.S.A. § 962(c). Of the two, "reinstatement is the preferred remedy to avoid future lost earnings," being the "obvious form of relief to make the plaintiff whole" and to eradicate the effects of discrimination from the workplace. *Ellis, supra,* 832 F.2d at 30. Accord: *Hopkins v. Price Waterhouse,* 920 F.2d 967, 976–77 (D.C.Cir.1990) and *Ezold v. Wolf, Block, Schorr and Solis–Cohen,* 758 F.Supp. 303, 305–06 (E.D.Pa.1991).

■ Reinstatement should be denied if plaintiff's return to the workplace will disrupt the employer's operations to an intolerable degree, *Hopkins v. Price Waterhouse,* 737 F.Supp. 1202, 1210 (D.D.C.1990), or if it would displace an innocent third party now holding the job plaintiff would be given. See, e.g., *Daniels v. City of Alcoa,* 732 F.Supp. 1467, 1478–79 (E.D.Tenn.1989).[14] However, the mere possibility of hostility or resentment on the part of co-workers or management does not preclude reinstatement. Such factors are merely considerations to be weighed in the balance. Allowing the probability of hostility to negate reinstatement would give in to the attitudes which brought about the discrimination in the first place, an intolerable result. *Hopkins, supra,* 920 F.2d at 980 and *Lander v. Lujan,* 888 F.2d 153, 158 (D.C.Cir.1989).

■ Gallo has requested reinstatement, and there is no reason to deny her that relief. Although her return will undoubtedly engender some hostility and resentment, she worked under such pressures before, and was able not only to cope, but to perform her job quite well. The fact that she is returning subject to court order, which will include a proviso against any

further harassment of her and a requirement that she be treated in the same manner as the salesmen, will do much to ameliorate these pressures. Additionally, in other situations requiring a far greater degree of interpersonal cooperation than will be required here, the courts have not hesitated to order reinstatement, and we see no reason not to do likewise. See, e.g., *Hopkins, supra,* 920 F.2d 967 (Title VII plaintiff ordered made a partner in an accounting firm.) and *Ezold, supra* (Title VII plaintiff ordered made a partner in a law firm.)

The alternative of awarding Gallo front pay would involve some difficulty, since we have no accurate prognosticator of her future employment prospects. She has been unemployed for three years despite consistent efforts on her part to locate work, and we have no way of gauging how much longer she will be out of work.

■ Finally, in light of our finding that Gallo was terminated for discriminatory motives and not due to any legitimate reasons on the employer's part, she is entitled to have all references to the termination and her alleged misconduct in June, 1988, which we found to be a mere pretext for discrimination, expunged from her personnel file. *Rosemond v. Cooper Industrial Products,* 612 F.Supp. 1105 (N.D.Ind.1985) and 42 U.S.C. § 2000e–5(g).

*Emotional distress*

■ Compensatory damages for emotional distress are not available under Title VII, *Protos v. Volkswagen of America, Inc.,* 797 F.2d 129, 138 (3d Cir.1985), *cert. denied,* 479 U.S. 972, 107 S.Ct. 474, 93 L.Ed.2d 418 (1986), but are available under the PHRA. The Pennsylvania Supreme Court has held that the legal and equitable relief available under the PHRA includes damages for humiliation and mental an-

---

her rightful place in the job market.... [Citations omitted.]....
Like back pay, front pay serves to make the victim of discrimination whole and restore the economic position that [she] would have enjoyed but for the employer's unlawful conduct.
*Hurst v. Beck,* 771 F.Supp. 118 (E.D.Pa.1991).

**14.** Although we cast our discussion in terms of the availability of reinstatement under Title VII, it is equally available as a remedy for defendant's violation of the PHRA, and we rest our order granting reinstatement on that ground as well.

guish resulting from unlawful discrimination. *Pennsylvania Human Relations Commissions v. Zamantakis*, 478 Pa. 454, 387 A.2d 70, 73 (1978). Accord: *Lubin v. American Packaging Corp.*, 760 F.Supp. 450, 452 (E.D.Pa.1991).

Gallo testified that she was greatly distressed by her termination, that it caused a serious disruption in her life at a time when she should have been happy about the birth of her child; that she was thrust unexpectedly into a financially precarious situation; that John Powell's revocation of her right to use a demonstrator worked a serious hardship on her; and that she had no car of her own, having sold it at Struncis' advice while she worked at John Powell. All of this testimony was credible and we believe that these circumstances caused Gallo emotional distress. We find that she is entitled to the sum of $500.00 as fair and reasonable compensation for her mental anguish and emotional distress.

*Punitive damages*

Gallo seeks punitive damages for the egregious manner in which she was terminated. Punitive damages are not available under Title VII. *Protos, supra,* 797 F.2d at 138. The Pennsylvania Supreme Court has yet to decide whether punitive damages are recoverable under the PHRA, but federal district courts have, correctly we believe, predicted that it will rule punitive damages recoverable. *Galeone v. American Packaging Corp.*, 764 F.Supp. 349, 351 (E.D.Pa.1991), citing *Zamantakis, supra,* 387 A.2d at 73.[15]

Under Pennsylvania law, punitive damages are awardable for conduct which is:

outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the

harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.

*Restatement (Second) of Torts,* § 908(2), adopted by the Pennsylvania Supreme Court in *Martin v. Johns–Manville Corp.*, 508 Pa. 154, 494 A.2d 1088, 1096 (1985). Punitive damages are appropriate only when the defendant acted with the intent to harm or with reckless indifference to the harm likely to flow from his conduct. *Field v. Philadelphia Electric Co.*, 388 Pa.Super. 400, 565 A.2d 1170, 1182 (1989).

As discussed above, we do not find evidence of such conduct here. Although Struncis certainly exhibited a lack of sensitivity in terminating Gallo in the manner he did, his conduct did not evidence the reckless indifference necessary to warrant imposition of punitive damages. Cf. *Woodson v. AMF Leisureland Centers, Inc.*, 842 F.2d 699, 701–03 (3d Cir.1988), (punitive damage award upheld in wrongful discharge action in which bartender was fired as a result of her refusal to serve alcohol to a visibly intoxicated patron) and *Walsh v. SmithKline Beckman,* 89–5833 (E.D.Pa. July 10, 1991), (available on WESTLAW at 1991 WL 126869) (Verdict upheld awarding punitive damages under PHRA based on evidence that defendant "took adverse employment actions against plaintiff with reckless indifference to plaintiff's right to testify on behalf of a co-worker claiming discrimination").

*Conclusions of Law*

Based upon the evidence presented and the findings of fact, we reach the following conclusions of law:

Under Title VII and the PHRA, Gallo is entitled to an award of back pay against John Powell. She is entitled to recover the difference between her actual wages after termination from John Powell and the amount she would have earned but

15. Before September, 1990, the federal district courts were split on this issue. For a list of decisions supporting both points of view, see: *Galeone, supra,* 764 F.Supp. at 351.

Since September, 1990, however, most federal district courts which have addressed the issue

have predicted that the Pennsylvania Supreme Court would permit recovery of punitive damages under the PHRA. For a list of decisions supporting both points of view, see: *Galeone, supra,* 764 F.Supp. at 351–52.

for her termination from John Powell, reduced by deductions for any periods of time she would not have worked had she remained at the dealership.

Although Gallo was compensated exclusively by commissions, and there is no way to recreate her earnings over the past three years, we can gauge, with a reasonable degree of accuracy what she would have earned by tracking the commissions earned by other full-time John Powell salespersons.

She is eligible to recover back pay damages for a three-year period preceding the filing of her complaint with the Pennsylvania Human Relations Commission ("PHRC"). John Powell has the burden of proving, by a preponderance of the evidence, that substantially equivalent positions were available to Gallo and that she failed to exercise reasonable diligence in attempting to secure such a position. John Powell has not met that burden.

 Gallo is entitled to prejudgment interest on the back pay award from the date of her termination to the date of judgment calculated at the prevailing IRS rates set forth in section 6621(b) of the Internal Revenue Code, and to post-judgment interest on the award, also calculated by using the prevailing IRS rates.

Gallo is entitled to compensation for the mental anguish and emotional distress which she suffered as a result of her termination and the events leading up to it.

Gallo is not entitled to punitive damages.

Gallo exercised reasonable diligence in attempting to secure a position comparable in salary and benefits to her position at John Powell, but, due to circumstances beyond her control, has been unable to secure such a position during the three years since her termination.

Gallo made a reasonable and good-faith effort to retain her employment at Shirn's and did not knowingly or willfully engage in any conduct which she knew would result in her termination from Shirn's.

 Gallo's employment by Shirn's does not toll the accrual of back pay.

Gallo is entitled to reinstatement to her former position as an automobile salesperson at John Powell.

Gallo should be reinstated to her former position as an automobile salesperson at John Powell and, incident to said reinstatement, should receive the same commission percentage and the same benefits as are currently given to all other salespersons with four years' experience.

Gallo is entitled to have any reference to her termination and the reasons therefor expunged from her employment record at John Powell. John Powell will be directed to see that such action is taken.

## ORDER

For the reasons stated in the accompanying memorandum, IT IS ORDERED THAT:

1. Plaintiff is awarded back pay in the amount of $84,831.81; additional back pay at the rate of $416.45 per week from the date of this order until final judgment; prejudgment interest calculated from the date of termination to the date of final judgment; post-judgment interest calculated from the date of final judgment to the date of payment in full of the judgment; costs and counsel fees; front pay calculated at the rate of $416.45 per week from the date of final judgment to the date defendant reinstates plaintiff on its payroll or plaintiff notifies defendant she does not wish to resume employment, whichever shall first occur. Front pay shall also terminate thirty-one (31) days from the date of final judgment if plaintiff does not resume employment within thirty (30) days from the date of final judgment, due notice of reinstatement having been given by defendant pursuant to paragraph 4 of this order.

2. Plaintiff is directed to submit a proposed schedule calculating pre-judgment interest and post-judgment interest, using the interest rates set forth in section 6621(b) of the Internal Revenue Code. Plaintiff's statement should be submitted within fourteen (14) days from the date of this order.

3. If defendant disagrees with plaintiff's calculation of interest, it shall file its

own proposed schedule within ten (10) days of the filing of plaintiff's schedule. Failing receipt of defendant's counter-proposal within the time period allotted, the court will deem plaintiff's proposal unopposed and direct the Clerk of Court to enter judgment accordingly.

4. Defendant shall reinstate plaintiff to her former position as an automobile salesperson. Defendant is directed to contact plaintiff within fourteen (14) days from the date of final judgment to make suitable arrangements for her to resume employment no later than thirty (30) days from the date of final judgment. If she elects to return to defendant's employ, plaintiff shall be treated in all respects as if she had been continuously employed at the dealership since May, 1987, the date she was hired. In the event plaintiff returns to defendant's employ, she shall receive the same commission percentage and the same benefits as are then currently provided to all other salespersons with four years' experience.

5. If plaintiff elects to return to defendant's employ, defendant shall take appropriate steps to ensure that plaintiff will be treated professionally and not be harassed. Defendant shall advise all of its employees of the provisions of this paragraph of this order, namely the direction that plaintiff be treated professionally and not be harassed.

6. Defendant shall expunge from plaintiff's employment record any reference to her termination or matters incident thereto, including her alleged misconduct leading up to the termination.

7. If plaintiff wishes to proceed on the previously asserted demand for counsel fees, 42 U.S.C. § 2000e–5(k), she is directed to file a statement of counsel fees and costs incurred in pursuing this action within fourteen (14) days from the date of this order. Plaintiff's statement should include a breakdown indicating the nature of work performed by counsel, the date on which such work was performed, and counsel's hourly rate. It should be accompanied by an affidavit or some form of verification from counsel indicating the average prevailing hourly rate in the locality where counsel practices for representation in cases of this type.

8. Defendant shall have ten (10) days following the filing of plaintiff's statement of counsel fees to file a response contesting the amount sought.

9. If no counter-statement is timely filed, the court will make its ruling accordingly.

10. Final judgment is deferred until disposition of the issue of attorney's fees and costs.

## APPENDIX

### BACK PAY CALCULATIONS

1. **Chet Schick**
 a. **Base year gross earnings**
 June 16, 1987 to June 15, 1988 $17,673.42
 b. **Calculation period gross earnings**

| | |
|---|---|
| June 16, 1988 to June 15, 1989 (Annualized)[1] | $21,441.94 |
| June 16, 1989 to June 15, 1990 (Annualized) | 31,641.69 |
| June 16, 1990 to June 15, 1991 (Annualized) | 16,803.60 |

 c. **Calculation period gross earnings as a percentage of base year earnings**

| | |
|---|---|
| June 16, 1988 to June 15, 1989 | 16% above base year |
| June 16, 1989 to June 15, 1990 | 80% above base year |
| June 16, 1990 to June 15, 1991 | 5% below base year |

1. The annual income figures supplied to the court were not given in 365 day increments. The court converted all figures labeled "annualized" to annual income figures.

2. **Dave Johnson**
 a. **Base year gross earnings**
 **June 16, 1987 to June 15, 1988**

 Actual $19,656.00
 Adjusted:[2] $19,656.00 + 1,786.91 = $21,442.91
 (Johnson took a one-month leave of absence during this period.)

 b. **Calculation period gross earnings**
 **June 16, 1988 to June 15, 1989**

 Actual—June 16, 1988 to June 27, 1989 = $18,745.00
 (Johnson took a three-month leave of absence during this period.)
 Adjusted: $18,745.00 + 5,517.14 = $24,262.00

 **June 16, 1989 to June 15, 1990**

 Actual—June 28, 1989 to June 27, 1990 = $24,396.00
 (Johnson took a one-month leave of absence during this period.)
 Adjusted: $24,396.00 + 2,290.93 = $26,686.93

 **June 16, 1990 to June 15, 1991**

 Actual—June 27, 1990 to June 12, 1991 = $ 9,857.00
 (Johnson took a six-month leave of absence during this period.)
 Adjusted: $10,308.90 + 10,308.90 = $20,617.79

 c. **Calculation period earnings as a percentage of adjusted base year earnings**

 | | |
 |---|---|
 | June 16, 1988 to June 15, 1989 | 13% above base year |
 | June 16, 1989 to June 15, 1990 | 24% above base year |
 | June 16, 1990 to June 15, 1991 | 4% below base year |

3. **Schick's and Johnson's combined average calculation period earnings reflected as a percentage of base year earnings**

 | | |
 |---|---|
 | June 16, 1988 to June 15, 1989 | 14.5% above base year |
 | June 16, 1989 to June 15, 1990 | 52% above base year |
 | June 16, 1990 to June 15, 1991 | 4.5% below base year |

4. **Carol Gallo**

 a. **Base year gross earnings**
 **June 16, 1987 to June 15, 1988** $18,592.08[3]

 b. **Projected lost earnings**
 **June 23, 1988 to June 22, 1989**

 14.5% × 18,592.08 = $ 2,695.85
 +18,592.08

 $21,287.93

 **June 23, 1989 to June 22, 1990**

 52% × 18,592.08 = $ 9,667.88
 +18,592.08

 $28,259.96

 **June 23, 1990 to June 22, 1991**

 − 4.5% × 18,592.08 = $ −836.64
 +18,592.08

 $17,755.44

---

2. "Adjusted" refers to the fact that the figures submitted were adjusted to account for the fact that Johnson did not work the entire year. The amounts he presumably would have earned (calculated on the basis of his actual earnings) have been added to estimate his probable earnings had he worked the entire year.

3. This figure was calculated as 52 × Gallo's average weekly wage, $357.54.

June 23, 1991 to December 10, 1991

24 weeks × $341.45 = $ 8,194.80

**TOTAL LOST EARNINGS (COMMISSIONS)** $75,498.13