**Jackey B. GRIFFITHS, Plaintiff,**

v.

**CIGNA CORPORATION and Marlene Graham, Defendants.**

Civ. A. No. 91–2356.

United States District Court, E.D. Pennsylvania.

June 27, 1994.

Alan B. Epstein, Jablon, Epstein and Wolf, Philadelphia, PA, for plaintiff.

Stephanie A. Middleton, Susan D. Salisbury, James B. Herman, CIGNA, Philadelphia, PA, for defendants.

## MEMORANDUM AND ORDER

VanARTSDALEN, Senior District Judge.

### I. Brief Procedural History

After his May 1990 discharge by defendant CIGNA Corporation (CIGNA), plaintiff Jackey Griffiths filed this action on April 11, 1991, alleging claims of racial and national origin discrimination and retaliatory discharge from employment in violation of federal and Pennsylvania statutory law, as well as several common law claims, all stemming from plaintiff's denial of promotion and subsequent discharge from defendant CIGNA's employ.[1] (See Complaint, Filed Doc. No. 1.) After a trial in March 1992, the jury returned a verdict against defendants on plaintiff's claims for retaliatory discharge and for malicious prosecution.[2] The jury awarded plaintiff $377,500.00 in damages. (Filed .Doc. No. 45.) Defendants filed a motion for a new trial and an amendment of judgment which I denied in an order entered May 13, 1992. (Filed Doc. Nos. 50, 57.)

Defendants appealed from that order, and in an opinion filed March 17, 1993 the Court of Appeals for the Third Circuit remanded the case for entry of judgment in favor of defendants on the malicious prosecution claim and directed a new trial on the retaliation claim. See Griffiths v. CIGNA Corp., 988 F.2d 457, 472 (3d Cir.1993). The Court of Appeals held that the trial judge failed to properly instruct the jury that, under the evidence presented in the case, plaintiff had to prove by a preponderance of the evidence that the sole cause of his discharge was retaliation for filing an EEOC complaint.[3] Plaintiff then petitioned for a writ of certiorari to the Supreme Court, which was denied on October 4, 1993. See Griffiths v. CIGNA Corp., —— U.S. ——, 114 S.Ct. 186, 126 L.Ed.2d 145 (1993).

---

1. In a complaint lodged with the EEOC on March 7, 1990, plaintiff alleged that he was denied a promotion because he was Jamaican.

2. Prior to the trial plaintiff withdrew his claims for discrimination, and at the trial I directed a verdict in favor of defendants on the claims of false arrest and imprisonment, specific intent to harm, and intentional infliction of emotional dis-

tress. The jury found in favor of defendants on the defamation claim. See Griffiths v. CIGNA Corp., 988 F.2d 457, 462 n. 3 (3d Cir.1993).

3. On retrial, this dictate was scrupulously observed and no issue is presently raised .as to the jury instructions regarding liability.

After a four day retrial beginning on April 11, 1994 on the retaliatory discharge claim, the jury returned a verdict in favor of plaintiff. In response to relatively simple and straightforward interrogatories—crafted to comport with the Third Circuit's mandate on remand and approved by counsel for both sides—the jury found that plaintiff had proved by a preponderance of the evidence that the sole cause of plaintiff's discharge was retaliation for his having filed a claim of employment discrimination with the EEOC after he was denied a promotion.[4] The jury awarded compensatory damages in the amount of $485,000.00 [5] and punitive damages in the amount of $750,000.00.[6] In accord with the prior agreement of counsel, the judgment was entered only against defendant CIGNA.

Defendant CIGNA filed the present motion for judgment as a matter of law, or in the alternative, for a new trial and/or remittitur, on April 28, 1994. (Filed Doc. No. 102.) For the reasons set forth below, the motions will be denied.

## II. *Judgment as a Matter of Law*

Defendant premises its motion for judgment as a matter of law pursuant to Rule 50(b) [7] on two grounds: 1) the claim under the Pennsylvania Human Relations Act (PHRA) should have been dismissed, because this court did not have subject matter jurisdiction over that claim; and 2) "no reasonable jury could find based on the evidence that (i) CIGNA's reason for Plaintiff's discharge was false and that retaliation was the sole cause of the discharge; or (ii) that Plaintiff was entitled to any damages, compensatory or punitive." (Filed Doc. No. 102 at 2.)

A judgment as a matter of law is appropriate only where the jury's verdict is not supported by sufficient evidence to allow reasonable jurors to arrive at the verdict. *Walter v. Holiday Inns, Inc.,* 985 F.2d 1232, 1238 (3d Cir.1993); *Link v. Mercedes–Benz of N.A., Inc.,* 788 F.2d 918, 921 (3d Cir.1986). Although a scintilla of evidence is not enough to withstand a motion for judgment as a matter of law, the denial of a motion for judgment as a matter of law is proper unless the record "is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief." *Denneny v. Siegel,* 407 F.2d 433, 439–40 (3d Cir.1969); *see also Walter,* 985 F.2d at 1238; *Simone v. Golden Nugget Hotel and Casino,* 844 F.2d

---

4. The jury was asked to answer three questions, the first of which concerned defendant's liability:

> Did the plaintiff Jackey Griffiths prove by a preponderance of the evidence that the sole cause for CIGNA terminating plaintiff's employment was to retaliate against plaintiff because plaintiff had filed charges of employment discrimination against CIGNA with the Equal Employment Opportunity Commission (the EEOC)?
> Answer: YES.

5. The second interrogatory queried:

> If you answered "yes" to Question No. 1, what amount of compensatory damages do you award for the retaliatory discharge?
> Answer: $485,000.00.
> The jury had been instructed that the award of compensatory damages, if any, was to reflect their finding of the amount of lost wages in the past and in the future ("back pay" and "front pay"), as well as compensation for emotional suffering ("pain and suffering"), if any. Tr. Trans. at 4–77.

6. The third interrogatory queried:

> If you answered "yes" to Question No. 1, state the dollar amount of punitive damages you

award against CIGNA, if any, for the retaliatory discharge.
> Answer: $750,000.00.
> The jury had been instructed that punitive damages were to be awarded only if defendant acted with bad motive and in reckless indifference to the interests of others, that an award of punitive damages was entirely within the jury's discretion and not mandated by an award of compensatory damages, and that the sole purpose of punitive damages is to punish outrageous conduct and to deter like conduct in the future. Tr.Trans. at 4–79.

7. Federal Rule of Civil Procedure 50(b) provides that:

> Whenever a motion for a judgment as a matter of law made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion.
> Fed.R.Civ.P. 50(b). In this case, defendant properly moved for judgment as a matter of law both at the close of plaintiff's case and at the close of all the evidence. *See* Tr.Trans. at 3–69; *see also* Tr.Trans. at 4–13.

1031, 1034 (3d Cir.1988). The court is not free to weigh the evidence or to pass on the credibility of witnesses or to substitute its judgment of the facts for that of the jury. *Lightning Lube v. Witco Corp.*, 802 F.Supp. 1180, 1885 (D.N.J.1992), *aff'd by* 4 F.3d 1153 (3d Cir.1993). Moreover, a court "considering a motion for [judgment as a matter of law] must view the evidence, together with all reasonable inferences therefrom, in the light most favorable to the verdict winner." *Rotondo v. Keene Corp.*, 956 F.2d 436, 438 (3d Cir.1992). The fundamental principle guiding the court when considering a motion for judgment as a matter of law is that there must be a minimum of interference with the jury and its deliberative processes. *Lightning Lube*, 802 F.Supp. at 1185. A case may not be taken away from the jury merely because "a measure of speculation and conjecture is required" when facts are in dispute and fair-minded individuals may draw differing inferences. *Id.* (quoting *Lavender v. Kurn*, 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1946)). Therefore, this court must determine only whether the evidence and the justifiable inferences in favor of the prevailing party afford any rational basis for the verdict.

### A. Subject Matter Jurisdiction

Defendant premises its motion for judgment as a matter of law in part on its contention that plaintiff's failure to exhaust his administrative remedies under the PHRA deprived this court of subject matter jurisdiction.[8] This contention was the subject of a motion to amend defendants' answer to the complaint[9] and a motion for summary judgment filed by defendants, both of which were denied by order entered March 30, 1994. (*See* Filed Doc. Nos. 81, 82, 85, 86, 87.) For the reasons set forth in the memorandum accompanying that order, as well as those set forth in the discussion below, I find that the contention that plaintiff failed to exhaust his administrative remedies is similarly unavailing in the context of a motion for judgment as a matter of law.

█ In the order entered March 30, 1994, defendants were denied leave to amend their answer to the complaint by which they admitted to exhaustion of remedies. (Filed Doc. No. 87 at 12.) Both federal and Pennsylvania courts urge leniency in allowing amendment, except in cases "where unfair surprise or some comparable prejudice" would result. *Pilotti v. Mobil Oil Corp.*, 388 Pa.Super. 514, 565 A.2d 1227, 1229 (1989); *see also* Fed.R.Civ.P. 15(a); Pa.R.Civ.P. 1033; *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971); *Cornell & Co. v. Occupational Safety and Health Review Comm'n*, 573 F.2d 820, 823–24 (3d Cir.1978). I found that defendants' proposed amendment would "cause great prejudice, would cause further undue delay, and [was] of questionable [good] faith." (Filed Doc. No. 87 at 12.) The motion to amend was denied.

Although defendant's contention—that plaintiff's failure to exhaust his administrative remedies under the PHRA deprived this court of subject matter jurisdiction—has some support in Pennsylvania case law, these cases have never dealt with the effect of an unqualified admission of subject matter jurisdiction in the answer to the complaint. De-

---

8. Defendant ventures this argument only with respect to the entirety of the PHRA claims, but not with respect to the retaliatory discharge claim under Title VII or the PHRA, as it did in its motion for summary judgment. *See* Filed Doc. Nos. 81, 82, 85, 86, 87. In the motion for summary judgment, defendants argued that plaintiff had failed to exhaust his administrative remedies because he did not file a separate claim alleging subsequent retaliatory discharge, and that his original charge of denial of promotion as a result of discrimination was inadequate. Apparently defendant has abandoned this argument and now accedes to my decision that the retaliation claim "stemmed from" or "grew out of" the original filing, and was therefore within the scope of the original filing. *See* Filed Doc. No. 87 at 15–16, 18–20.

9. In their answer to the complaint, defendants admitted without qualification that plaintiff had exhausted his administrative remedies. *See* Complaint, Filed Doc. No. 1, at ¶ 6; Answer, Filed Doc. No. 5, at ¶ 6.

All motions prior to the present motion were filed by defendants CIGNA and Marlene Graham, Assistant Director of Security and plaintiff's supervisor at the time of the incidents *at issue in* this action. The present motion is filed by defendant CIGNA only, as judgment was entered only against CIGNA.

fendant correctly asserts that the Pennsylvania Supreme Court has characterized "PHRC exhaustion as an issue of subject-matter jurisdiction which may not be waived." (Filed Doc. No. 102 at 10; *see also, e.g., Clay v. Advanced Computer Applications, Inc.,* 522 Pa. 86, 559 A.2d 917 (1989); *Murphy v. Commonwealth,* 506 Pa. 549, 486 A.2d 388 (1985).) This strict approach has a certain superficial appeal that belies the complexity of the issue. As one commentator noted, it is "sometimes difficult to tell whether a given restriction on a court's authority is one of subject matter jurisdiction or one relating to jurisdiction of the person, jurisdiction over property, venue, or *some procedural restriction on the manner of invoking jurisdiction.*" Robert C. Casad, Jurisdiction in Civil Actions 1–6, § 1.01[1] (1991) (emphasis added).

In many other contexts, Pennsylvania courts have demonstrated willingness to suspend the exhaustion requirement in exceptional cases, thereby suggesting that failure to exhaust administrative remedies is more accurately characterized as a procedural, rather than a jurisdictional, issue. *See, e.g., Ohio Casualty Group of Ins. Cos. v. Argonaut Ins. Co.,* 514 Pa. 430, 525 A.2d 1195 (1987) (stating that the rule requiring exhaustion of administrative remedies is not intended to set up procedural obstacles to recovery, and that the rule should be applied only where available administrative remedies are adequate); *Feingold v. Bell of Pa.,* 477 Pa. 1, 383 A.2d 791 (1977) ("As with all legal rules, the exhaustion of administrative remedies rule is neither inflexible nor absolute, and this court has established exceptions to the rule.").

Exhaustive research uncovered no case in which a Pennsylvania court, confronted by an unqualified admission of record of exhaustion of administrative remedies, decides that failure to exhaust cannot be waived or that the defendant cannot be estopped from later altering the admission by contending plaintiff failed to exhaust his state administrative remedies. I conclude that exhaustion of administrative remedies is a procedural restriction to the right to bring suit under the PHRA that may be subject to estoppel

and waiver due to unqualified admission in an answer that all administrative procedures have been exhausted. *See also cf. Daugherity v. Traylor Bros., Inc.,* 970 F.2d 348, 351–52 n. 5 (7th Cir.1992) (confronting this issue in a Title VII context).

Moreover, similarly exhaustive research uncovered no case in which a Pennsylvania court allowed a defendant to amend its answer to change an unqualified admission of exhaustion to a denial of exhaustion, thereby depriving the court of subject matter jurisdiction and subjecting the plaintiff to a devastating loss of forum, all after a trial, an appeal, and a remand order. Indeed, the closest case on that point strongly suggests that Pennsylvania courts would not grant defendants leave to amend under the circumstances of the present case.

In *Ligon v. Middletown Area Sch. Dist.,* the plaintiff brought an action against the defendant school district as well as a contractor performing renovations for the school district. *Ligon,* 136 Pa.Cmwlth. 566, 584 A.2d 376, 379 (1990). Before the plaintiff rested his case he entered into a joint tortfeasor's settlement with the school district. The issue of the school district's liability nevertheless went to the jury for apportionment of liability between the school district and contractor. When the jury returned a verdict against the school district in an amount exceeding the settlement amount with the school district, the plaintiff reversed his position and argued that the school district was immune from suit on the grounds of local governmental immunity, thereby contending in essence that the trial court lacked jurisdiction to enter a judgment against the school district. The plaintiff sought to have the school district relieved of liability so that the contractor would remain as the sole defendant responsible for the jury's entire award. *Id.* The court held that the doctrine of judicial estoppel, the well-established principle that a party may not assert contrary positions in the same or related proceedings, applied to "prevent a party from changing his or her position regarding jurisdiction because it suited that party's interest." *Id.* 584 A.2d at 380.

In the present case and unlike *Ligon*, there is no allegation of a nefarious motive underlying defendant's attempt to change its position regarding jurisdiction. At the same time, however, defendant fails to provide a "good" reason for changing its position; its sole explanation for changing its unqualified admission of exhaustion of administrative remedies is that the admission was made "only through inadvertence." (Filed Doc. No. 82 at 6.) Defendant's admission of exhaustion apparently was based on a misreading (or non-reading) of documents in its possession.[10] After a diligent search of both the printed media and the electronic database, I am unable to uncover any Pennsylvania case that directly address the conundrum caused by a defendant who seeks to change an admission made "only through inadvertence," particularly when this admission would impose severe prejudice on plaintiff.[11] In the absence of such guidance, this court must predict how the Pennsylvania Supreme Court would rule if the issue were presented to it. *Hospital Support Serv., Ltd. v. Kemper Group, Inc.*, 889 F.2d 1311, 1313 (3d Cir. 1989).

The reasoning of *Ligon* is persuasive and convinces me that the principle of judicial estoppel and/or waiver would be adopted by the Pennsylvania Supreme Court if faced with the facts of the present action. *See cf. Avondale Cut Rate, Inc. v. Associated Excess Underwriters, Inc.*, 406 Pa. 493, 178 A.2d 758, 760 (1962) (citing the "established rule that an amended answer which is irreconcilable and inconsistent with admissions in the original answer, without explanation for the inconsistencies, is insufficient to prevent the granting of judgment in favor of the plaintiff."). Therefore, to the extent that defendant premises its motion for judgment as a matter of law as to the PHRA claim pursuant to Rule 50(b) on lack of subject matter jurisdiction, the motion will be denied.

### B. *Insufficient Evidence with respect to liability*

Defendant further contends that it is entitled to judgment as a matter of law because plaintiff did not satisfy his burden of proving by a preponderance of the evidence that retaliation was the sole cause of the decision to discharge plaintiff.[12] It is clear,

10. As described more fully in my March 30, 1994 order, plaintiff had filed a charge with the EEOC, which transmitted the charge pursuant to a worksharing agreement to the PCHR, the *Philadelphia* Commission on Human Relations. Apparently believing that he had filed a charge with the PHRC—the *Pennsylvania* Human Relations Commission—plaintiff brought this action under the PHRA, the Pennsylvania Human Relations Act. *See* Filed Doc. No. 87. Defendant failed to recognize the difference between the PCHR and the PHRC until two years has passed from the initiation of this action. Whether the referral by the EEOC to the PCHR is adequate to confer jurisdiction under state law to proceed under the PHRA is an issue that will not be addressed in this case because the answer to the complaint admitted to all jurisdictional prerequisites to an action under the PHRA.

11. The order of March 30, 1994, however, does cite *Daugherity*, a Seventh Circuit case regarding a Title VII action in which the defendant filed a motion for leave to amend its answer to include an additional defense, which the defendant claimed had only recently come to its attention: that plaintiff failed to file a charge with the EEOC within 180 days of his layoff, as required by the statute. *Daugherity*, 970 F.2d at 350. The plaintiff objected to this motion on the grounds that more than three and one-half years had passed since the defendant had filed its original

answer. The district court granted the motion, however, and the defendant amended its complaint to include the additional defense that the plaintiff had not exhausted his administrative remedies.

The Court of Appeals for the Seventh Circuit agreed that "as a general rule, district courts should allow amendment quite freely," but concluded that the district court abused its discretion, and that it should have examined the circumstances surrounding the amendment with much more scrutiny. *Id.* at 352. The plaintiff had argued that the three and one-half year delay between the original answer and the amendment was excessive and unexcused. The defendants, in turn, provided the Court with no adequate explanation for their delay in spotting the plaintiff's procedural shortcomings.

In addition, the Court of Appeals faulted the district court for not adequately considering the extent of the prejudice imposed on the plaintiff by allowing the amendment. The Court stated that prejudice to the plaintiff in *Daugherity* was "self-evident," and therefore found that "the district court should not have permitted [the defendant] to rely on [the plaintiff's] failure to exhaust administrative remedies." *Id.* at 353.

12. The "sole cause" language was adopted and rigorously applied in both jury instructions and interrogatories, in response to the decision of the

however, that ample evidence was presented to allow a reasonable jury to find that defendant discharged plaintiff solely in retaliation for his having filed a charge with the EEOC.

Defendant claims that it "produced evidence at trial of a legitimate non-discriminatory reason for the discharge: Plaintiff's refusal to cooperate with his employer's investigation of reported thefts." (Filed Doc. No. 102 at 13.) Defendant asserts that plaintiff failed to prove that this proffered explanation was false, and that retaliation was instead the sole cause of the decision to discharge plaintiff. (*Id.*) I disagree, but—more importantly—so did the jury. Among other things, plaintiff presented evidence from which the jury could properly find that the investigation was a sham; that although many months had elapsed since the computer thefts began, the investigation was initiated only after plaintiff filed a charge with the EEOC; that the investigation focused solely on plaintiff despite other possible suspects; and that the investigation was abandoned after plaintiff was discharged, despite the continuing theft of computers.[13] Defendant's claim that plaintiff "refused to cooperate" in the investigation after criminal charges against him were dismissed was also severely undermined.[14] It is thus clear from the evidence that a reasonable jury could—and did—conclude that defendant's proffered reason for discharging plaintiff was a pretext, and that the sole cause of plaintiff's discharge was retaliation for his having filed a charge with the EEOC. *See Hicks v. St. Mary's Honor Center*, —— U.S. ——, ——, 113 S.Ct. 2742, 2751, 125 L.Ed.2d 407 (1993) (requiring that once an employer has met its burden of production by coming forward with a nondiscriminatory business reason for discharging a protected employee, the employee must then prove that the business reason was pretextual *and* that he was intentionally discriminated against).

Defendant further argues that *Quiroga v. Hasbro, Inc.*, 934 F.2d 497 (3d Cir.1991), is on point with this case. Defendant is correct in stating that "*Quiroga* held that the timing of the discharge in relation to the filing of a EEOC complaint does not alone create an inference of discrimination."[15] (Filed Doc. No. 102 at 14.) Indeed, the *Quiroga* court was emphatic that the "timing of the discharge in relation to [an] EEOC complaint

---

Court of Appeals for the Third Circuit in *Griffiths v. CIGNA Corp.*, 988 F.2d 457 (3d Cir.1993). *See also cf. Seman v. Coplay Cement Co.*, 26 F.3d 428 (3d Cir.1994).

13. CIGNA had suffered a "rash" of computer thefts beginning in 1989 and continuing through at least the first few months of 1990. *See* Tr. Trans. 1–49. CIGNA's investigation of these thefts was remarkably dilatory and lackadaisical, *see* Tr.Trans. 3–129—3.140, until March of 1990, shortly after plaintiff filed a charge with the EEOC, when it launched an intensive investigation that plaintiff's evidence demonstrated focused virtually exclusively on plaintiff, notwithstanding other candidates (or the possibility— never suggested—that the thefts were not even committed by one person or group of persons). *See, e.g.,* Tr.Trans. 2–261; 3–176. Although the computer thefts continued after plaintiff's discharge, the investigation was apparently abandoned or discontinued. *See* Tr.Trans. 3–30.

14. Defendant refused to allow plaintiff to bring his lawyer to an investigatory interview. Defendant claimed that it had a long-standing corporate policy against "third party intervention" as its justification for the refusal. Plaintiff presented evidence demonstrating that not only was this policy ambiguous and not likely to be known to plaintiff, *see, e.g.,* Tr.Trans. 2–132; 2–149, but that the policy was clearly directed at union activity, and never expressly mentioned attorneys. Tr.Trans. 2–146. Defendant's bald posttrial assertion that the "evidence is undisputed that CIGNA's policy and practice is to terminate employees who will 'cooperate' only through or in the presence of the employee's attorney" therefore is not accurate; moreover, the assertion blatantly contradicts that portion of the present motion in which defendant appeals from the denial of admission into evidence material intended to substantiate this "undisputed" policy, a denial defendants now call "harmful error." *See* Filed Doc. No. 102 at 16, 30–32. If defendant believes the existence of this policy is "undisputed," defendant cannot also claim to be harmed by evidentiary rulings disallowing proof of it.

15. Defendant apparently is under the misapprehension that *Quiroga* "affirmed a district court's grant of the employer's motion for summary judgment on claims alleging retaliatory discharge." Filed Doc. No. 102 at 14. To the contrary, the grant of summary judgment applied to the plaintiff's age discrimination claims and his state law claims for breach of contract and intentional infliction of emotional distress. His retaliation claims under Title VII and its New Jersey analog went to trial. *Quiroga*, 934 F.2d at 499.

may suggest discriminatory motive," but that an inference could not be created based on timing alone. *Quiroga,* 934 F.2d at 501 (quoting *Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir.1989), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990)). The plaintiff in *Quiroga,* however, contrary to defendant's claims, did not present "the same kind of evidence plaintiff proffered in the present action." (Filed Doc. No. 102 at 14.) Rather, the plaintiff in *Quiroga* "presented only his subjective belief [that he was constructively discharged], but absolutely no supporting evidence that Hasbro's motives were improper." Moreover, the defendant employer presented evidence that it did not retaliate, but instead made extraordinary efforts to placate plaintiff and retain him in its employ. *Quiroga,* 934 F.2d at 501–02. In contrast, in the present case, plaintiff presented sufficient evidence to support his contention that defendant's motives were improper: he presented evidence that the investigation was a sham designed to elicit a response from him on which defendant could premise the discharge it planned in retaliation for his having filed a charge with the EEOC. *See supra* notes 13 & 14. The verdict suggests that the jury accepted this version of events.

Defendant's other cited cases are similarly unavailing. Defendant claims that the present action "is on all fours with the facts" in *Savko v. Port Authority of Allegheny County,* 800 F.Supp. 275 (W.D.Pa.1992). Defendant is especially enamored of *Savko* 's finding that the plaintiff had "failed to establish a *prima facie* case of retaliation because she did not establish a causal connection between the filing of the discrimination charge and her subsequent discipline and eventual discharge from employment." *Savko,* 800 F.Supp. at 286. However, in sharp contrast with *Savko,* in the present action plaintiff had no such problem establishing the requisite causal connection. Plaintiff presented credible evidence that his EEOC charge was known to at least some of defendants' employees before the investigation was launched. *See, e.g.,* Tr. Trans. 2–186—2–190. Moreover, in *Savko* the plaintiff did not prove that the employer's stated reason for her discharge was pretextual. Rather, the

employer presented evidence demonstrating that the plaintiff was "disciplined for legitimate, *non-discriminatory* reasons and eventually discharged for her repeated acts of insubordination." *Savko,* 800 F.Supp. at 287. In the present action plaintiff presented competent evidence demonstrating to the jury's satisfaction that defendant's reason for plaintiff's discharge—that he failed to cooperate in an investigation—was pretextual.

Ironically, had defendant claimed that plaintiff was fired because, *notwithstanding* dismissal of the criminal charges against him, defendant still firmly believed that plaintiff was a thief, defendant might not have been held liable. If the jury accepted such a contention, then retaliation could not have been the "sole cause" for the discharge. Yet defendant never attempted to make this seemingly obvious argument (and—assuming for the moment that the argument could have been made in good faith—such oversights cannot be corrected in post-trial motions). Instead, defendant relied on its so-called policy against attorney attendance at investigatory interviews as the only reason for the discharge. The jury decided, not surprisingly, that this was a spurious reason, and concluded that retaliation was the sole cause for the discharge.

Therefore, to the extent that defendant premises its motion for judgment as a matter of law on insufficient evidence demonstrating that retaliation was the sole cause of plaintiff's discharge, the motion will be denied.

### C. *Insufficient evidence with respect to damages*

 Defendant beseeches this court for judgment as a matter of law on damages, or, in the alternative, remittitur, contending that the damage award is unsupported by the evidence. Under Rule 50(b), a damage verdict when supported by proper evidence may not be set aside as excessive unless it is so high as to shock the conscience of the court, or unless it appears that the jury was biased or acted capriciously or unreasonably. *Lovejoy v. Monongahela Connecting R.R. Co.,* 137 F.Supp. 42 (W.D.Pa.1955). A trial judge must be "extremely reluctant to interfere

with the time-honored power of the jury, in the exercise of its collective judgment, to assess the damages sustained by the plaintiff." *Tann v. Service Distributors, Inc.,* 56 F.R.D. 593, 598 (E.D.Pa.1972) (Becker, J.). Similarly, remittitur is a "device employed when the trial judge finds that a decision of the jury is clearly unsupported and/or excessive." *Spence v. Board of Educ.,* 806 F.2d 1198, 1201 (3d Cir.1986). Use of remittitur falls within the discretion of the trial judge who is "in the best position to evaluate the evidence presented and determine whether or not the jury has come to a rationally based conclusion." *Id.*

■■■ Under either theory, it is not the court's prerogative to substitute its own judgment as to the amount of damages for that of the jury. Thus, regardless of whether the trial judge agrees or disagrees with the jury's verdict, the verdict must be upheld so long as it is supported by a "minimum quantity of evidence from which a jury might reasonably [decide to] afford relief." *Ford Motor Co. v. Summit Motor Prods., Inc.,* 930 F.2d 277, 290 (3d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991).

Defendant contends that plaintiff failed to present evidence "to support anything but a nominal finding of damages for either front or back pay." Defendant additionally contends that plaintiff failed to prove by competent evidence any pain and suffering for which some portion of the compensatory damages were undoubtedly awarded, and that plaintiff provided "no evidence ... that after his discharge Plaintiff suffered any loss of reputation, humiliation, anguish or loss of life's pleasures." Defendant further contends that plaintiff's "punitive damage award is clearly disproportionate to CIGNA's conduct and the nominal compensatory damages plaintiff actually suffered." (Filed Doc. No. 102 at 19–22.)

Both Title VII and the PHRA permit the award of compensatory damages for lost wages. *See* 42 U.S.C. § 2000e–5(g); Pa.Stat.

Ann. tit. 43, § 962(c)(3) (West Supp.1994); *Gallo v. John Powell Chevrolet, Inc.,* 779 F.Supp. 804, 811, 817 (M.D.Pa.1991). Clearly, however, damages in this case were awarded under the PHRA, because the court made no determination of liability.[16] (Nor would any such determination be necessary under the Title VII claim. *See Roebuck v. Drexel University,* 852 F.2d 715, 737–38 (3d Cir.1988) (applying the principle of preeminence of jury verdicts when the elements of proof are identical in concurrently tried claims).)

The PHRA also allows the award of "any other legal or equitable relief as the court deems appropriate." Pa.Stat.Ann. tit. 43, § 962(c)(3) (West Supp.1994). The Pennsylvania Supreme Court has interpreted "legal or equitable relief" to encompass "damages for humiliation and mental anguish." *Pennsylvania Human Relations Comm'n v. Zamantakis,* 478 Pa. 454, 387 A.2d 70, 73 (1978); *see also Gallo,* 779 F.Supp. at 815–16; *Lubin v. American Packaging Corp.,* 760 F.Supp. 450, 452 (E.D.Pa.1991). "As a practical matter, some degree of emotional distress stems from any violation of a plaintiff's rights, whether that right be rooted in the Constitution, state or federal statutes or the victim's status as a human being." *Spence,* 806 F.2d at 1202–03 (Higginbotham, J., concurring in result). The difficulty lies in measuring "accurately reasonable compensation" for injuries such as emotional distress. *McDonald v. United States,* 555 F.Supp. 935, 971 (M.D.Pa.1983). Damages for emotional distress are by their very nature incapable of precision. In the present action, however, the jury was properly instructed to measure plaintiff's damages including mental anguish, humiliation, and the loss of life's pleasures, and no objection was raised at trial or in the present motion as to the instructions. *See* Fed.R.Civ.P. 51.

■■■ Punitive damages in this case also are awarded under the PHRA. Therefore, "the propriety of an award of punitive damages for the conduct in question, and the

---

**16.** The conduct at issue in the present action antedates the 1991 revisions of Title VII, the provisions of which have been held not to be retroactive. *See Landgraf v. USI Film Prods.,* ——

U.S. ——, ——, 114 S.Ct. 1483, 1508, 128 L.Ed.2d 229 (1994). Therefore, under the law in effect at the time of the conduct at issue, no jury trial was permitted on the Title VII claims.

factors the jury may consider in determining their amount, are questions of state law." *Browning–Ferris Indus., Inc. v. Kelco Disposal, Inc.,* 492 U.S. 257, 278, 109 S.Ct. 2909, 2922, 106 L.Ed.2d 219 (1989). Furthermore, "[i]n reviewing an award of punitive damages, the role of the district court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered." *Id.* The Pennsylvania courts have adopted Section 908(2) of the Restatement (Second) of Torts regarding the imposition of punitive damages. *Rizzo v. Haines,* 520 Pa. 484, 555 A.2d 58, 69 (1989).

> That provision permits punitive damages for conduct that is "outrageous because of the defendant's evil motives or his reckless indifference to the rights of others." A court may award punitive damages only if the conduct was malicious, wanton, reckless, willful, or oppressive. The proper focus is on "the act itself together with all the circumstances including the motive of the wrongdoer and the relations between the parties...." In addition, the actor's state of mind is relevant. The act or omission must be intentional, reckless, or malicious.

*Id.* (citations omitted). The jury was instructed on compensatory and punitive damages in strict accordance with these and all other pertinent standards. Defendant raised no objections to the instructions either at trial or in the present motion. *See* Tr. Trans. 4–81—4–83; Fed.R.Civ.P. 51.

■■■■ The jury awarded plaintiff compensatory damages in the amount of $485,000.00. Plaintiff presented proper evidence that he lost wages, past and future. Plaintiff also testified to the mental anguish he suffered as a result of the unlawful discharge. Although the jury apparently adopted a generous view of plaintiff's damages, this view was nonetheless supported by proper evidence. In addition, the jury awarded plaintiff $750,000.00 in punitive damages. In support of his argument for punitive damages, by proper evidence presented throughout the trial plaintiff demonstrated to the satisfaction of the jury by a preponderance of the evidence that defendant engaged in outrageous conduct that displayed a reckless indifference to the interests of others. In support of an award of punitive damages sufficient to deter such conduct in the future, plaintiff properly placed in evidence defendant's Annual Report, demonstrating that it was a multi-billion dollar corporation so that a sufficiently large judgment was necessary if it was to have any deterrent value.

Therefore, to the extent that defendant's motion for judgment as a matter of law or, in the alternative, for remittitur, is premised on the sufficiency of plaintiff's evidence with respect to compensatory and punitive damages, the motion will be denied.

### III. *Motion for a New Trial*

Defendant premises its motion for a new trial on two general grounds: 1) allegedly harmful evidentiary rulings at trial; and 2) the verdict was against the weight of the evidence.

■■■■ Defendant correctly notes that the standard for granting a motion for a new trial is often less demanding than that for granting a motion for judgment as a matter of law. (Filed Doc. No. 102 at 24.) *See also Lightning Lube,* 802 F.Supp. at 1185. A new trial may be granted "to all or any of the parties and on all or part of the issues ... in an action where there has been trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R.Civ.P. 59(a). Several reasons will support the grant of a new trial. *Klein v. Hollings,* 992 F.2d 1285, 1289 (3d Cir.1993); *Lind v. Schenley Indus., Inc.,* 278 F.2d 79, 90 (3d Cir.), *cert. denied,* 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960). A trial court has broad discretion in ruling on a motion for a new trial under Rule 59(a) on the grounds of improperly admitted or excluded evidence, the court's ruling for points of charge, misconduct of counsel, or newly discovered evidence. *Link,* 788 F.2d at 921–22; *Lind,* 278 F.2d at 90; *Lightning Lube,* 802 F.Supp. at 1185. This broadened discretion is exemplified by the fact that in ruling on a motion for a new trial the trial court is permitted to

consider the credibility of the witnesses and weigh the evidence. *Id.*

 The trial court's discretion is more limited, however, in granting a new trial because the jury's verdict is against the weight of the evidence: a new trial is proper in those instances only if the jury's verdict resulted in "a miscarriage of justice" or where the verdict "cries out to be overturned or shocks our conscience." *Williamson v. Conrail,* 926 F.2d 1344, 1353 (3d Cir.1991); *Lind,* 278 F.2d at 90; *Lightning Lube,* 802 F.Supp. at 1185–86. When a motion for a new trial based on the weight of the evidence is granted, the court has "to some extent at least substituted [its] judgment of the facts and the credibility of the witnesses for that of the jury." *Id.* at 1186 (quoting *Fineman v. Armstrong World Indus., Inc.,* 774 F.Supp. 266 (D.N.J.1991)). Lest the judge usurp the prime function of the jury as the trier of fact and thereby denigrate the jury system, the trial court is not allowed to "substitute its own judgment for that of the jury simply because the court might have come to a different conclusion." *Lightning Lube,* 802 F.Supp. at 1186 (citations omitted). Similarly, a dispute over credibility does not justify a new trial. *Id.*

A. *Evidentiary Rulings*

Defendant contends that "the Court committed harmful errors of law on evidentiary rulings" by excluding the progress notes and prior testimony of plaintiff's psychologist, by refusing to admit into evidence defendant's record of dealing with other employees who refused to cooperate in internal investigations, and by admitting evidence pertaining to the prosecution of plaintiff. Errors in evidentiary rulings are not harmful unless substantial prejudice results. Fed.R.Evid.

103(a). I will consider the alleged errors seriatim.

1. **Dr. Schoenberg's notes**

 Defendant argues that it was prejudiced by my refusal to admit into evidence a portion of the 1991 trial testimony of plaintiff's psychologist, Gary Schoenberg, and Schoenberg's May 9, 1990 and May 15, 1990 progress notes. Defendant first claims that the excluded testimony would have demonstrated that plaintiff had no desire to cooperate with defendant's investigation of the computer thefts, that plaintiff intended to turn all his employment matters over to his attorney, and that plaintiff had an offer of another job in New York, where he intended to move by the end of May 1990. Further, defendant claims that the evidence would have impeached plaintiff's credibility by contradicting statements he made to the jury. (Filed Doc. No. 102 at 25–30.) [17]

After reviewing the 1991 trial transcript, however, I find that defendant was not harmed by its exclusion.[18] Defendant claims that "Schoenberg's testimony was crucial to CIGNA's defense in that it shows that Plaintiff had no intention to cooperate with the investigation of the theft of computers that occurred on Plaintiff's last night on the job." [19] (*Id.* at 28.) The transcript, however, offers defendant at best ambiguous support for this contention:

> And he talked about his fears in returning back to CIGNA. And since he arrested [sic] for suspicion of theft, he had more extensive fear about going back there and we talked about the concern about going back to the job. And he was very frightened about what they may do to him....
>
> ....

---

17. Oddly enough, defendants had filed a motion in limine to preclude the admission by plaintiff of Schoenberg's testimony. *See* Filed Doc. No. 89. Although defendants detail their subsequent frantic attempts to subpoena Schoenberg, and even allude to some sort of conspiracy between Schoenberg and plaintiff to keep the psychologist out of court, at this stage of the proceedings the concern is with the harmful impact of the evidentiary rulings, not its genesis.

18. Defendant also sought the admission of Schoenberg's "progress notes." The notes were, however, the subject of Schoenberg's 1991 testimony, the examination of which will therefore suffice for purposes of the present motion.

19. At no point prior to this did defendant claim that the investigation was to focus on the computer thefts of that one night; at all points prior to this, defendant claimed that it was investigating all the computer thefts and that plaintiff was implicated in the entire "rash" of thefts.

And Mr. Griffiths talked about ongoing thoughts and preoccupations with his job status and he mentioned that he received a letter stating that he needed to cooperate with the investigation about the theft or that he would be fired.

He stated that he had no desire to cooperate since they falsely accused him of an incident. He felt they were trying to incriminate him. He stated that he is turning all of the transactions over to his attorney at the time. He was planning a move to New York at the end of the month to work at a job as a security manager for Lord and Taylor's and reported that he was being offered a position and was looking forward to this and he wanted to put the problem of CIGNA behind him.

(*Id.* Ex. A.) Although defendant apparently thinks this passage somehow exonerates it, a reasonable jury could easily conclude that plaintiff entertained an entirely understandable fear of defendant and its investigation, particularly since defendant had implicated him to the police, an implication that led to his arrest. A reasonable jury could easily conclude that his reluctance to cooperate with the investigation was equally understandable. Indeed, the jury could well have found that this passage supports plaintiff's contention that he needed a lawyer at his side if he were to submit to defendant's investigatory interview.

More importantly, it seems to continue to evade defendant that plaintiff's state of mind with respect to the investigation is not the issue. Plaintiff presented sufficient evidence from which a reasonable jury could conclude that defendant's investigation was a sham, *see supra* notes 13 & 14, and plaintiff's intentions of cooperating or not with the investigation are entirely irrelevant to that finding. Plaintiff's intentions are equally irrelevant to the jury's finding of liability for retaliation.

Plaintiff's intentions with respect to his future at the defendant corporation might, however, have some bearing on the jury's assessment of compensatory damages. But only the most tortured reading of Schoenberg's testimony could absolve defendant. The testimony discusses plaintiff's reaction to defendant's conduct, and a reasonable jury could find that the testimony proves little more than that plaintiff had been driven by defendant's conduct to such a state of despair and fear that he could not contemplate returning. Far from absolving defendant, this testimony could well have provided the proof of mental anguish defendant claims plaintiff failed to prove.

Given the ambiguity of Schoenberg's testimony in terms of the jury's assessment of damages, as well as the testimony's irrelevance to the jury's finding of liability, I find that defendants were not harmed by the refusal to admit Schoenberg's 1991 testimony and progress notes into evidence.

### 2. Comparators

■ Defendant further argues that they were harmed by evidentiary rulings that excluded evidence of "comparators," which defendant describes as proof of its "consistent application of its policy and practice of requiring employees to cooperate in investigatory interviews without an attorney and to discharge employees who refuse to deal directly with their managers on a company investigation." (Filed Doc. No. 102 at 30–31.) This argument apparently stems from the cross-examination of Marjorie Stein, Assistant Vice President of Employee Relations at CIGNA. *See* Tr. Trans. 2–138 et seq. During the trial, counsel for defendant sought to question Ms. Stein about how frequently she had given advice on dealing with employees who refused to cooperate in investigations without the presence of a lawyer. Although these questions went beyond the scope of the direct examination, counsel for defendant was permitted to proceed until he asked the witness to "tell us about the situations that you remember." Tr. Trans. 2–141. At that point, counsel for plaintiff objected, and the objection was sustained as to specific instances:

> THE COURT: ... You're getting into many situations. She can certainly, as I've indicated at sidebar, she can testify as to what—if there is a consistent policy, what that policy was, what the procedures were....

*Id.* Counsel for defendant then asked the witness about the policy:

A. My advice has always been when asked about that, that the employee should be advised that they must cooperate in the investigation. That if they refuse to cooperate in the investigation that they *could* be terminated.

Q. And have any employees been terminated as a result of not cooperating—cooperating in the investigation?

A. Yes.

*Id.* (emphasis added). Thus the question is whether defendant was harmed by the ruling that precluded the witness from going into detail about the other "situations" she remembered.

In support of its contention that it was harmed by this ruling, defendant appends to the present motion a list of instances in which employees were suspected of wrongdoing and required to cooperate in an investigatory interview. (Filed Doc. No. 102 Ex. D.) Presumably, this list reflects the instances to which Ms. Stein would have testified had she been permitted. The list consists of the employee's initials, the employee's job title and location, a synopsis of the action taken, and the name of the investigator. Under another column denoted "status" defendant indicates either "Termn." or "Active" followed by a date, which I take to be the date the investigation was undertaken and the decision with respect to the employee's status was taken. (*Id.*)

Even taking all of the facts given in the list as true, of the fourteen instances cited, only seven could have occurred prior to the events at issue in the present action and therefore be considered relevant to defendant's argument of "consistent application of its policy and practice."[20] (Any instances that occurred after the events at issue in the present action would be considered, at best, of a remedial or reactive nature and not relevant pursuant to Federal Rule of Evidence 402.) Of those seven instances, three involved employees who cooperated in the investigation and who were not terminated. There is no indication that any of those three requested an attorney. Another three of the seven instances involved employees who cooperated in the investigation and were terminated; all three of these employees had requested and been denied the presence of their attorneys, and, according to the list, all three had been informed that refusal to cooperate with the investigation *could* (not *would*) result in termination.[21] (*Id.*)

Thus defendant can point to exactly one pertinent instance to which Ms. Stein could have testified in detail about an employee who "refused to cooperate" in an investigation and was terminated. One instance, however, does not a "policy or practice" make. Moreover, in that instance, as in the others—and just as Ms. Stein testified—the employee was told that "refusal to attend an interview with Internal Security *could* result in termination." (*Id.*) (emphasis added). Clearly, defendant's evidence, even before any contradiction, examination or rebuttal by plaintiff is possible, is at best ambiguous and hardly proves defendant's contention that "when a CIGNA employee insists on the presence of an attorney, or refuses to cooperate with a

---

**20.** By counting seven I am giving defendant the benefit of the doubt: one instance states only "Termn. 1990" so chances are better than even that this instance occurred after plaintiff was terminated in May 1990 and is therefore better characterized as remedial or reactive in nature.

**21.** It bears noting that none of these instances involved employees located in Philadelphia or investigations conducted by Stein, Graham or any other of defendant's Philadelphia-based employees. This fact raises the question of hearsay. Stein can testify as to her general advice, but she cannot testify competently as to its application in a given situation unless she was involved in that situation.

Moreover, presentation of the information contained in the list in any written form clearly would constitute inadmissible hearsay: the writing would be offered to prove the truth of the matter asserted, that is, that other employees similarly situated to plaintiff also were subject to termination. *See* Fed.R.Evid. 801(c). Hearsay is not admissible except under one of the exceptions provided for by the Federal Rules of Evidence. Fed.R.Evid. 802. Such a compilation is not a "record of regularly conducted activity" or any of the other exceptions provided by Rule 803 that "possess circumstantial guarantees of trustworthiness sufficient to justify nonproduction of the declarant in person at the trial." Fed. R.Evid. 803 advisory committee's note. Nor would the list be admissible under any of the exceptions allowed by Rule 804.

corporate audit investigation without his attorney, CIGNA deems such conduct to be a refusal to cooperate and terminates regardless of whether the employee has filed a charge." (*Id.* at 30–31.) To the contrary, defendant's evidence as well as Ms. Stein's testimony shows that the so-called policy was not absolute. Moreover, the evidence is scant that such a policy existed at all: only four instances are provided in which the so-called policy was made known to the employee (and in each case, employees were told that they "could" be terminated, not that they "would" be terminated), and in only one instance was the threat carried out. (Curiously, only in that last instance does defendant neglect to describe the nature of the alleged misconduct).

Furthermore, even if defendant were able to provide more comparators and sought to have them admitted into evidence, it would have been necessary to also admit evidence supporting or challenging the reason for each discharge or retention, thus inflicting on the jury a series of mini-trials that would yield little if any relevant testimony.

Therefore, given the general lack of probity of the information contained in the list, I conclude that defendant was not harmed by the ruling that excluded testimony regarding comparators or any other presentation of such information.

### 3. Malicious prosecution

■■■■ Defendant's final contention with respect to evidentiary rulings is that it suffered harmful error when plaintiff introduced evidence "concerning the quality and thoroughness of Ms. Graham's investigation of the computer thefts, the completeness of her disclosure to the police, [and] the reasonableness of her suspicion as to plaintiff's involvement in the thefts." (Filed Doc. No. 102 at 32.) Defendant argues that notwithstanding the Third Circuit's ruling making this evidence "inadmissible and irrelevant," plaintiff's counsel "was permitted to argue directly and indirectly that CIGNA retaliated

against him by giving his name to the police." (*Id.*) Defendant further argues that this "clearly inflamed the jury's passion" to such an extent that cautionary instructions could not cure the defect. (*Id.* at 32–33.)

Nowhere in the Third Circuit's remand of this case does it say that evidence regarding defendant's investigation of the computer thefts, the completeness of Graham's disclosure to the police, and the reasonableness of her suspicion as to plaintiff's involvement in the thefts is "inadmissible and irrelevant." *See Griffiths v. CIGNA Corp.,* 988 F.2d 457 (3d Cir.1993). Rather, the Third Circuit reversed the judgment on the malicious prosecution claim in light of that Court's conclusion that plaintiff did not prove a key element of the tort of malicious prosecution under Pennsylvania law: that the defendants were responsible for the institution of the proceedings. *Id.* at 467. Indeed, the Court stated that "the jury's findings ... simply established that the [defendants] acted with malice and without probable cause." *Id.* The only reference the Court made to the status of the malicious prosecution evidence on retrial was that "[the malicious prosecution claim] will not be retried on the remand, for the [defendants] cannot be liable to Griffiths for malicious prosecution." *Id.* This is not the same as foreclosing all evidence related to the investigations, disclosure to the police, and suspicions, when that evidence has other legitimate uses. (Nor does the remand order specifically define "retaliation" to exclude giving plaintiff's name to the police, though all parties agreed to confine the retaliation at issue in the retrial to the discharge itself. *See* Tr.Trans. 1–11.)

In essence, of course, defendant's contention is that the malicious prosecution claim was, in effect, retried on the remand, and that defendant was held liable to plaintiff by virtue of the size of the damage award.[22] Plaintiff's contention is that his discharge was in retaliation for his filing a charge with the EEOC, and that the circumstances lead-

---

**22.** Perhaps in anticipation of this possibility, defendant had filed a motion in limine seeking to preclude introduction of any evidence related to the prosecution of plaintiff by the Philadelphia police. That motion was denied immediately

before the trial without prejudice to counsel objecting to the introduction of evidence that would have been covered by the motion. Tr.Trans. 1–10.

ing up to the discharge—including the facts of plaintiff's arrest—prove that defendant's stated reason for the discharge was pretextual, and that instead unlawful animus motivated the discharge. *See, e.g.,* Tr.Trans. 2–33.

All parties to this action—as well as the court—therefore walked an extremely fine line when evidence related to plaintiff's arrest, prosecution and confinement was presented, *see, e.g.,* Tr.Trans. 2–35, and the jury was repeatedly issued cautionary instructions regarding their consideration of that evidence. *See, e.g.,* Tr.Trans. 2–42, 2–166. Defendant now claims that notwithstanding such cautionary instructions, it was harmed by the introduction of evidence related to the prosecution. (Defendant cannot claim that it shied away from discussing plaintiff's arrest, prosecution and confinement, however: in his opening statement, counsel for defendant told the jury that Graham prepared a report on the computer thefts, "turned it over to the police," and "Mr. Griffiths was arrested." Tr.Trans. 1–53.)

The question is thus what impact the admission of evidence related to the arrest, prosecution and confinement had on the jury, and whether the jury collapsed a finding of liability for malicious prosecution into their finding of liability and damages. The first prong of defendant's argument in this respect is that evidence concerning the quality and thoroughness of Graham's investigation of the computer thefts contributed to inflaming the jury.[23] In response to plaintiff's questions, Marlene Graham testified that a series of computer thefts began in January of 1989, increasing in volume in October of 1989, Tr.Trans. 3–131, but that she did not call the police "every time" a computer was stolen. Tr.Trans. 3–135. Although she could not substantiate her recollection with any notes, police reports, or other writing, Tr.Trans. 3–133, Graham claimed to have called the police twice. When she first called in October or November of 1989—at least nine months after the thefts began—she recollects that the 911 operator told her "that because we were a large corporation and because we had our own in-house security

force that they—they would not become involved, that it was the responsibility of Cigna's security people to do those investigations." Tr.Trans. 3–137. Graham agreed that, as a former police officer, she found it highly unlikely that a 911 operator would have the authority to "cut off" an investigation, but admitted that she did nothing in protest. Tr.Trans. 3–138. A "month or two later," though, she called 911 again. *Id.* This time, she "was told that they would send a car out to take a report," *id.,* but "they, in fact, never did send a car to take the complaint." Tr.Trans. 3–140. Again, Graham admitted that she never protested this shabby treatment by the police. Tr.Trans. 3–141. Graham also admitted that despite the continuing disappearance of thousands of dollars of computer equipment over several months, she did not call the police again until March 13, 1990, the day after plaintiff reacted angrily to the news that he would not be promoted. Tr.Trans. 3–130. Counsel for defendant did not object to any of Graham's testimony.

It is clear from Graham's testimony regarding her investigation as well as that of others that defendant conducted a remarkably shoddy investigation of what it claimed was a substantial loss. It is also clear that plaintiff did not present this evidence to prove that defendant intended to maliciously prosecute plaintiff. Rather, the evidence supported plaintiff's theory of defendants' animus toward plaintiff. Thousands of dollars of computers were stolen over a thirteen month period, yet no real investigation was launched until March 1990, and when that investigation began, it focused almost exclusively on plaintiff. Although evidence concerning the investigation unavoidably overlaps with evidence that would be presented to prove a charge of malicious prosecution, plaintiff used the evidence to demonstrate defendant's animus toward him, and the jury was properly instructed to view it in that light.

Defendant further claims that it was harmed by the admission of evidence related to the completeness of Graham's disclosure to the police and the reasonableness of her suspicions about plaintiff, and that this testimony inflamed the jury and led it to improp-

**23.** Marlene Graham was Assistant Director of Security for CIGNA and plaintiff's supervisor.

erly punish defendant for malicious prosecution. The jury was repeatedly instructed that they were to assume that Graham gave accurate information to the police. *See, e.g.,* Tr.Trans. 3–163. When counsel for defendant properly objected to certain questions bearing on Graham's participation in the police prosecution, the objections were sustained and the testimony on that point halted. *See, e.g.,* Tr.Trans. 3–180. Undoubtedly, the jury could have inferred from the testimony that Graham gave the police a highly selective presentation of damning facts, and that her suspicion of plaintiff was unreasonable in light of her prior suspicion of other, equally worthy suspects. Nevertheless, this inference is relevant to plaintiff's claims of an animus that had its genesis in his filing an EEOC charge and culminated in his discharge, and was therefore admissible.

Moreover, plaintiff's claims of animus are relevant to his damages. The courts of this Circuit adhere to the rule that emotional distress damages must be evaluated in the light of all the circumstances surrounding the alleged misconduct. *Spence,* 806 F.2d at 1202 (citing *Carey v. Piphus,* 435 U.S. 247, 263, 98 S.Ct. 1042, 1052, 55 L.Ed.2d 252 (1978)). The liability and damage issues are further intertwined when plaintiff seeks punitive damages, as here. *See Spence,* 806 F.2d at 1202. "In order to prove that the defendant's conduct warranted punitive damages, plaintiff would have to present to the jury all the facts leading up to the defendants' decision" to terminate plaintiff. *Id.*

Therefore, to the extent that defendant premises the motion for a new trial on harmful error in evidentiary rulings, the motion will be denied.

### B. *Verdict against the weight of the evidence*

■ There is no doubt that the weight of the evidence supports the jury's finding of liability against defendant. *See* part II.B.

However, a court also may grant a motion for a new trial if the size of the verdict is against the weight of the evidence. *New Market Inv. Corp. v. Fireman's Fund Ins. Co.,* 774 F.Supp. 909, 917 (E.D.Pa.1991) (citing Charles A. Wright & Arthur R. Miller, 11 Federal Practice & Procedure § 2807 (1973)). A new trial on the basis that the verdict was against the clear weight of the evidence is "proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson,* 926 F.2d at 1353.

■ The jury awarded plaintiff compensatory damages in the amount of $485,000.00. Plaintiff presented evidence that he lost wages, past and future, as well as benefits, and in his closing argument plaintiff's counsel calculated the total lost wage to amount to $383,000.00. Tr.Trans. 2–60, 2–61, 4–41. (The jury was instructed that they were to make their own calculation in light of all the evidence presented to them, and that they were not to accept plaintiff's counsel's calculations unquestioningly. Tr.Trans. 4–59, 4–74.) Plaintiff also testified to the mental anguish he suffered as a result of the unlawful discharge. *See* Tr.Trans. 2–62. The jury apparently adopted a generous view of plaintiff's damages, but this view was nonetheless supported by competent evidence and the size of the verdict does not "shock the conscience."

Moreover, although defendant now objects to the size of the compensatory damages awarded, at no point did it object to the evidence presented in support of compensatory damages.[24] Further, on cross-examination defendant never once questioned plaintiff about any aspect of his claimed damages, tangible or intangible. And in his closing argument, counsel for defendant did not even address the issue of damages, except to ar-

---

**24.** At one point, as plaintiff's counsel moved to admit plaintiff's wage statements for 1989 and 1990, counsel for defendant objected "to the characterization as earnings from Cigna" because, he claimed—two years and almost two trials later—plaintiff's employer was Insurance Company of North America, not defendant CIG-

NA. Tr.Trans. 2–49. Counsel for defendant further stated that he would at some point make a motion to limit punitive damages against CIGNA (he didn't) and that "I'm not saying [the wage statement is] inadmissible. I'm just saying it shouldn't be characterized on the record as—as earnings from CIGNA." Tr.Trans. 2–50.

gue that plaintiff intended to move to New York even before his discharge.

■ In addition, the jury awarded plaintiff $750,000.00 in punitive damages. In support of his argument for punitive damages, by evidence presented throughout the trial plaintiff demonstrated by a preponderance of the evidence satisfactorily to the jury that defendant engaged in outrageous conduct that displayed a reckless indifference to the interests of others. In support of an award of punitive damages sufficient to deter such conduct in the future, plaintiff placed in evidence the Annual Report for CIGNA, demonstrating that it was a multi-billion dollar corporation.

Therefore, to the extent defendant premises its motion for a new trial on the contention that the verdict, either in terms of liability or damages, was against the weight of the evidence, the motion will be denied.